WHITE'S LUMBER & SUPPLY Co. *et al v.* COLLINS.

(In Banc. Oct. 2, 1939.)

[191 So. 105. No. 33546.]

McGehee and McGowen, JJ., dissenting in part.

662

Gilbert & Cameron, of Meridian, for appellant, White's Lumber & Supply Co.

J. V. Gipson, of Meridian, and Green, Green & Jackson, of Jackson, for appellant, Fred D. Temple.

Green, Green & Jackson and J. V. Gipson, for appellant, Fred D. Temple, on suggestion of error.

Williamson, Riddell & Riddell, **E. T. Strange**, and **R. M. Holmes,** all of Meridan, for appellee.

668

670

Argued orally by **Forrest B. Jackson**, for appellant, and by **Nate S. Williamson** and **J. A. Riddell**, for appellee.

**Per Curiam.**—Three members of the Court are of the opinion that there is no reversible error so far as concerns the appellant, Temple, wherefore as to him the judgment will be affirmed. As to the appellant corporation, two members of the Court are of the opinion that it was entitled to a peremptory instruction, while three members, including one of those voting for the peremptory instruction, have concluded that the entire judgment should be reversed, because, in their opinion, the verdict is against the great weight of the reasonably believable evidence. The result is that there are four votes to reverse as to the appellant corporation, and it must be so ordered.

Affirmed as to Temple; reversed and remanded as to the White's Lumber & Supply Company.

**Griffith, J.,** delivered an opinion.

Appellant corporation is a dealer in builders' supplies, and appellee is a contractor who had become in arrears in his account with the corporation. Appellant's resident manager, having failed to obtain a settlement, called in the general manager, and, according to appellee's version, these two on Sunday morning, June 13, 1937, went together to the home of appellee and having induced him to get in their automobile, they drove him, over his protest, about a mile into the country, and there demanded that he sign a deed of trust to cover the debt and assaulted him when he refused to do so,

Appellant corporation requested on its part a peremptory charge, and assigns the refusal thereof as error, on the ground that the alleged employer cannot be held liable because Sec. 1131, Code 1930, prohibits any work or employment on Sunday except works of necessity or charity or the like; that in consequence the managers could not be employed on Sunday to collect a debt or to negotiate its collection or security; that in further consequence the managers, in point of law and in respect to the matter mentioned, were not employes on this Sunday, and that therefore there was nothing upon which liability against the corporation by way of respondeat superior could rest.

The doctrine of respondeat superior has its basis in the fact that the employer has the right to supervise and direct the performance of the work by his employe in all its details, and this right carries with it the correlative obligation to see to it that no torts shall be committed by the employe in the course of the performance of the character of work which the employe was appointed to do. 18 R. C. L., p. 783. And in view of this responsibility, the employer has the right to fix the hours within which the work is to be performed, and he will not be liable for the conduct of his servant except during the fixed period and during such an additional fringe of time, as is not unreasonably disconnected from the authorized period. 1 Rest. Agency, Sec. 233; Primos v. Gulfport Laundry & Cleaning Co., 157 Miss. 770, 128 So. 507.

But it is within the lawful privilege of an employer to make his employe subject to call at any and all hours, or he may give an employe supervisory powers of a constantly continuing nature over property or over any department of the employer's business, and the fact that the employer has elected not to retain the means or power, as a practical matter, of superintendence over the performance of the work by the servant so entrusted, does not alter the rule as to the employer's ultimate liability. See the comment and illustrations under Section 233 in 1 Rest. Agency.

As already stated, the tort was committed in this case, if committed at all, by the general manager of the employer corporation in direct conjunction with the local manager. So long as a corporation has any considerable property and so long as it has any business which is to be preserved and kept going, some natural person must be on duty continuously in a supervisory and controlling position in respect to the business and at all times even throughout Sundays. This is the position which the general manager and the local manager occupy. Their duties are such as to make them subject to call, and even if it be at their own instance, at all times, day and night, through every twenty-four hours of the seven day week. They are the constant superintendents of all the work, and in every eventuality, and are the superintendents of their own work,—save perhaps during the actual sessions of the board of directors.

It follows therefore that what the managers do in the furtherance of the business of the employer as a going concern is under the supervision of the employer, and for any tort committed therein by the manager or managers the employer is liable, even though done on Sunday. It is not admissibly to be said that because the statute prohibits ordinary employment on Sunday, the manager or general manager cannot be an employe on that day. The statute expressly excepts works of necessity, which include emergencies. It is obviously a matter of necessity, as already pointed out, that the manager or general manager shall be always subject to the duty of decision and action, and upon his own call, even on Sunday; and while the collection or settlement of a debt is no work of necessity or emergency, save in rare instances of which the case here was not one, nevertheless, and for the reason stated, the relationship of employer and employe could and did exist between the corporation and the managers on this Sunday; and without question, the collection or settlement of a debt due the corporation was

within the character of work which their employment embraced.

The fact that the managers violated the law by engaging in a work prohibited by statute for the time being does not relieve the master, so long as there were present the two elements (1) that the servant then and there occupied the status of an employe, and (2) the conduct was within the scope of the appointed duties of the servant. 1 Rest. Agency, sec. 231; 39 C. J., p. 1294, sec. 1489; 14a C. J., p. 770, sec. 2832. The employer is prohibited by law to employ a person to commit at any time an assault and battery; yet if in the furtherance of the business of the master and as an incident to the performance of the duties of the character or kind which he was emloyed to perform, the servant commits an assault and battery, the employer is liable. Wise v. Peugh, 140 Miss. 479, 106 So. 81; Gill v. L. N. Dantzler Lbr. Co., 153 Miss. 559, 569, 121 So. 153. It would appear, therefore, that a sufficient test of liability is whether the tort was committed under the actual or potential supervision of the master, not whether the employer could have legally authorized it to be done, either as to time or manner.

But if it be thought that the relation of master and servant or principal and agent must be a valid legal relation at the very time of the commission of the tort, and that there can be no such relationship on Sunday except as confined to works of necessity or emergency, the same result is reached in this case by approaching the problem from the viewpoint of participation in the tort by way of procurement or incitement. Undoubtedly a natural person is as much responsible for torts committed by him on Sunday as on any other day; and undoubtedly if, instead of committing the tort himself, he employ another to do it on Sunday he would be liable, not on the basis of contract, but because he would be the procurer, the inciter,—particeps criminis.

The powers of a general manager of a corporation, insofar as concerns third persons without notice to the

contrary, are coextensive with the carrying on as a going concern of all the business of the company. Allen Gravel Co. v. Nix, 129 Miss. 809, 93 So. 244. Lake Shore, etc., R. Co. v. Prentice, 147 U. S. 101, 114, 13 S. Ct. 261, 37 L. Ed. 97, 103. In view of his broad powers, so stated, had the general manager employed a person to go on Sunday and collect a debt for the corporation and had embraced in the engagement the direction to the person so engaged to commit an assault and battery on the debtor if deemed necessary to accomplish the collection, the corporation would be liable, not by virtue of the validity of any such contract, but because the corporation had been the procurer of, or the inciter to, the tort,—was particeps criminis therein. One may not properly appoint an agent to commit a criminal or otherwise illegal act, but if the one directed to perform the act does the act directed, the person directing him may be responsible civilly if a tort is committed. I Rest. Agency, sec. 19, Comment a. And for the stronger reason, there would be liability when the managers themselves go out and commit the tort, instead of inciting another to do it, and even though on Sunday.

A painstaking search has failed to find any case squarely in point: but the following may be of some interest: Sullivan v. Thompson, 30 Cal. App. (2d) 675, 87 P. (2d) 62; Raduenz v. Kelley, 295 Ill. App. 622, 14 N. E. (2d) 509; Williams v. Ludwig Floral Co., 252 Pa. 140, 97 A. 206; and Gerretson v. Rambler Garage Co., 149 Wis. 528, 136 N. W. 186, 40 L. R. A. (N. S.), 457. We have been obliged to decide the point by resort to principle and analogy, as a result of which we have concluded that the employer corporation was not relieved of liability on account of the Sunday Statute, and that the corporation was not entitled to the peremptory instruction requested by it.

Anderson and **Ethridge, JJ.,** and **Smith, C. J.,** concur in the foregoing opinion.

**McGehee, J.**, delivered a dissenting opinion.

I find it necessary to dissent from the majority view in holding that the corporate defendant was not entitled to the peremptory instruction requested in the court below, hence I concur in the refusal of the Court to affirm the judgment appealed from as against the said appellant corporation.

The declaration charged, and it was necessary for the proof to show, that the appellant, Fred D. Temple, was acting within the scope of his authority and employment, as agent of the appellant corporation, in committing the alleged assault upon appellee. The record discloses that the tortious conduct complained of took place, if at all, on Sunday, at a time when the proof is silent as to whether Temple had any duties to perform on that day for and on behalf of the appellant corporation as its agent under and by virtue of his employment. Owing to the nature and character of the business in which the corporation was engaged—that of operating a retail lumber yard—the presumption is that he had no duties whatsoever to perform on that day under his employment unless it had become necessary to act for the preservation of the property of his employer, or in case of an emergency. The law suspended the relation of agency on that day except under the circumstances above stated. Not only did his duties fail to require, but the statute prohibited the rendering of the services contemplated by his employment except, as heretofore stated, where necessary for the preservation of the property entrusted to his management and operation, or in case of an emergency arising within the meaning of the statute.

No case has been called to our attention, nor has an investigation disclosed the statement of any rule by the textwriters or decision by any court where an employer has been held liable for the tort of an employee except where it has been committed within the scope of the appointed duties, either express or implied, which the em-

ployee could lawfully perform. The reports of our own and other states abound with decisions holding an employer liable for damages caused by the torts of employees committed in violation of the law, but in each instance the employee was, at the time of the commission of the tort, subject to the control of the employer and engaged in and about the performance of duties contemplated by his employment. Of course, it is not necessary that the employer should authorize the criminal act of the employee complained of in order to be liable, but it is necessary that the employer shall expressly or impliedly authorize the performance of the acts in connection with which the tort is committed. It is not contended that the employer in the case at bar expressly authorized the service alleged to have been undertaken by Temple on the Sabbath Day, nor can it be said that it was impliedly authorized, since the proof fails to show that he had ever theretofore undertaken, under any custom or usage, the performance of similar acts on that day with the acquiescence or approval of the employer.

But, it is urged that the employer itself participated in the conduct here complained of, in that L. C. Gilbert, the general manager of this and other lumber yards belonging to the appellant corporation, was present, aiding and abetting in the alleged tort in an effort to obtain a deed of trust for the corporation on Sunday. In the first place, however, the declaration only charges that Temple was accompanied by Gilbert on the occasion in question. It is not charged in the declaration that he participated in any manner in the alleged assault or that he sought in any way to obtain the execution of the deed of trust in question on that day. The declaration is silent as to whether Gilbert acquiesced in or protested against the alleged effort and conduct of Temple in that behalf. To permit a recovery on the theory that the appellant corporation participated through Gilbert would be to permit a recovery on a separate and distinct theory than that sued on. In the second place, Gilbert could not be the

alter ego of the corporation except within the real or apparent scope of his appointed duties under his employment, which was the management and operation of the lumber yards within the time permitted by law. Can it be said that he was acting within the real, or even within the apparent, scope of the appointed duties of his employment as general manager if resent and undertaking to obtain a deed of trust on Sunday, on a homestead, and without the wife joining therein, even if he had sought to do so without violence or duress? Since Gilbert was not the president, vice-president or other corporate official of the appellant company, but occupied the relation of an employee instead, he could not be the source of his own authority. The corporation itself was necessarily the source of any authority that he may have had, and he was therefore the alter ego of the corporation only when engaged in and about the performance of the duties within the real or apparent scope of his employment as a manager, which, so far as the Sabbath Day is concerned, were expressly limited by positive law to the preservation of the property of the corporation, and and to other cases of emergency.

Having no control of the services and physical activities of either Gilbert or Temple on the Sabbath Day, the relation of principal and agent could not exist on that day, except to the extent that they were subject to call, or owed the duty to act for the preservation of the property or in case of other emergency.

The fundamental idea of agency has its conception in something lawful that a person may do, and of a delegation by such person to another of the power to lawfully do that thing. The principal is responsible, of course, for the unlawful manner in which the agent does an authorized act. But, it seems to me that the difficulty presented in the case at bar when we undertake to apply this principle of liability is that the alleged agents were not engaged in the performance of any duty which they owed to their employer on that day under their employ-

ment. They were not performing an authorized act in an unlawful manner, but on the contrary, they are alleged to have committed the tort complained of while undertaking to render a service which was not only unauthorized on that day under their employment, but which, as heretofore stated, was an attempted service prohibited by law.

In view of the fact that the relation of a manager to a corporation is necessarily based on a contract of employment, and since it is also true that there cannot be a contract of employment to do any work on Sunday or to transact any business of the nature alleged to have been undertaken here, then how could Gilbert and Temple represent and render the corporation liable on the occasion in question under the principle of respondeat superior? Their physical conduct and activities were in no manner subject to the supervision or control of the corporation on that day. And, most assuredly, it would be beyond the contemplation of any employer that a manager or other employee would undertake to obtain a Sunday contract, peaceably or otherwise. Such a useless and nonsensical venture cannot be considered as being within the scope of anybody's employment. Certainly no manager would be so foolish as to suppose that he was acting in furtherance of his employer's business when undertaking to force a debtor at the point of a knife to sign a deed of trust on Sunday. It should be remembered that they did not go for the purpose of collecting the account in question. They knew he didn't have the money. The theory that they were trying to induce appellee to come in and sign the deed of trust the next day is beside the point. His case is that he was assaulted for not signing it then and there. Can it be supposed that the officials or directors of the corporation would have authorized or consented to these men going out on Sunday to get a deed of trust signed, even if they had thought that such an unheard of object could have been accomplished without the necessity of using force or violence, to say nothing of the

means employed? As heretofore stated, while it was not necessary for the corporation to have authorized the alleged assault as condition of liability, it does seem to me that under all of the authorities the assault must have occurred at a time when these men were employed to act for the corporation and while they were engaged about the duties required of them on that day within the scope of their employment.

It seems to be well settled that the employer has the right to fix the hours within which the work is to be performed; that he is not liable for the conduct of the servant except during the fixed period and such additional time as is not unreasonably disconnected from the period fixed—known as a "fringe of time." This rule is recognized in 1 Rest. Agency, section 233; Primos v. Gulfport Laundry & Cleaning Co., 157 Miss. 770, 128 So. 507. Examples of the application of the rule are given in 1 Rest. Agency, sec. 233, supra, as where a truckman is forbidden to make deliveries after five o'clock and one made a few minutes later is deemed within the scope of the employment; and likewise where a clerk is directed to lock a store at six o'clock and he keeps it open long enough thereafter to wait on the customers who enter just before that time, etc. But, the case at bar is no "fringe of time case." An appreciable time had intervened since the closing down of the lumber yard's operation on the day before, and the time for opening another week's business had not arrived. Moreover, the alleged effort to serve the employer occurred at a time prohibited by positive law. There existed no control or right of control on the part of the appellant corporation over the time or conduct of Gilbert and Temple on that Sunday. They had no duties to perform for the corporation on that day. Hence, it would seem to follow they were acting beyond the scope and authority of their employment when they went out on that day on the mission complained of.

It is conceded that a careful search of the authorities has failed to reveal that there is a case squarely in point; and that we are obliged to decide this point by a resort to principle and analogy. That being true, the plaintiff should have met the burden of proof imposed on him by law showing that Gilbert and Temple were subject to the control of their alleged employer on Sunday and that they were also engaged in the performance of the duties required or contemplated by their employment to be performed on that day.

If the incident complained of had occurred on a week day, then the appellee would not have had the burden of proving that Gilbert and Temple were acting within the scope of their employment. Such fact would have been presumed, because of the character of the positions which they respectively held. But, when the proof disclosed that it was alleged to have occurred on Sunday, then the burden was cast upon the appellee to prove that they were acting within the scope of the duties required of them on that day under their employment. This was true by reason of the fact that the law of the state prevented their undertaking such service on that day. There was no attempt on the part of appellee to meet this burden. It is true that ordinarily it would not do to hold that a plaintiff in a suit against a corporation must prove the authority of the manager to act on the occasion in question, but an entirely different situation is presented where the law prohibits and makes it a criminal offense for the manager to engage in the service in connection with which his tort is committed. It is presumed that he would not engage in a service in violation of the law, and that he has no authority from his employer or anyone else so to do. This being true, then the requirement that the plaintiff should prove that the manager was authorized to act on Sunday for the corporation is merely the application of the well settled rule that a plaintiff must prove every material fact which is not presumed. It is never presumed that an individual or corporation has

authorized an agent to render service on a day prohibited by law. If such authority is not presumed, then it necessarily follows that it must be proved, since its existence is the sole basis of the doctrine of respondeat superior.

If the views hereinbefore stated are correct, then it follows that the peremptory instruction requested by the appellant corporation should have been granted.

I am also of the opinion, shared by two of the other judges, that the case should be reversed and remanded as to the individual defendant, Temple, for the reason that the verdict is against the overwhelming weight of the believable testimony.

**McGowen, J.,** concurs in this dissent as to the White's Lumber & Supply Company.

**Ethridge, J.,** delivered the opinion of the court on suggestion of error.

J. M. Collins brought suit against White's Lumber & Supply Company and Fred D. Temple, manager of the company at Meridian, Mississippi, and also a stockholder therein, the action being for a tort alleged to have been committed by Temple while acting for and on behalf of said company, in trying to collect or secure an account claimed to be owing to it by J. M. Collins. The case was decided here on its merits on October 2, 1939, and is reported in 191 So. 105; suggestion of error has been filed on behalf of Fred D. Temple, but none on behalf of the plaintiff, or on behalf of the lumber company.

In the former opinion the facts were not discussed with reference particularly to Fred D. Temple, the per curiam opinion merely stating the result as to him, the judgment against him being affirmed by an equally divided court, while the judgment against the lumber company was reversed and remanded. It was, and is, the opinion of the affirming Judges that the evidence was sufficient to sustain the liability of Fred D. Temple. There was a sharp

conflict in the testimony offered by the plaintiff and by the defendant in regard to what actually occurred the day of the alleged wrong done to Collins, as he claims. In the suggestion of error it is earnestly contended that the judgment should also be reversed as to Temple, and that no sound distinction could be made between the proof offered in the case as to him, and that offered in regard to the lumber company.

Questions of fact, and matters of dispute in the evidence, are for the jury, which has the advantage of the appellate court in determining questions of veracity and fact, since the witnesses are seen and heard while giving their testimony, with other advantages not possessed by the appellate court. Furthermore, when the verdict of the jury is challenged as being against the weight of the evidence, the trial court must bring to bear its judgment in the matter, and it has the same power as this Court to set aside the verdict of the jury. The trial judge also has the advantage of seeing the witnesses, and hearing them testify, may observe their demeanor, and knows something of their standing in the community where the cause of action arises.

Of course, in torts the liability is joint and several, and a verdict may be rendered against one of the tort feasors, and not against another, so far as the law is concerned. The Court here is reluctant to disturb the verdict of the jury, approved by the trial judge, on the ground that it is contrary to weight of the evidence. That is especially true where more than one witness testifies on behalf of one of the parties who is not directly interested in the result of the case. This Court has not the right to set aside a verdict as contrary to the weight of the evidence where there is testimony not improbable on its face, and where the witnesses so testifying have not been impeached in the manner known to the law, and reasonable men could arrive at different conclusions, depending upon their judgment of the capacity of the witness, and his veracity and willingness to respond to the truth. We do not crave

such power, and defer to the judgment of the jury and of the trial court, unless the preponderance of the evidence against a verdict is so great as to indicate that passion, prejudice or corruption entered into its rendition.

The testimony of all the parties—that is to say, of J. M. Collins, Fred D. Temple and E. L. Gilbert, general manager of the lumber company—showed that there was a controversy or dispute between J. M. Collins and the lumber company about an account claimed to be owing by Collins to the company. J. M. Collins was a building contractor, and he had obtained supplies of materials for the construction of buildings from White's Lumber & Supply Company.

Several days prior to the misconduct, as alleged, on the part of Temple and Gilbert, there had been a discussion of this account, and efforts by Temple to secure its payment, or a mortgage or deed of trust upon property owned, or claimed to be owned by Collins, to secure the debt. Collins would not admit the correctness of the account; but, according to Temple, he had agreed to secure it; while according to Collins, he had not agreed to secure the account, nor had he agreed to the correctness thereof.

Temple had a note and deed of trust prepared for the signature of Collins and his wife, the note dated June 7th, and the deed of trust describing the debt as evidenced by the note bearing said date, the deed of trust itself having blank date, blank signature space and blank acknowledgment space. The 7th was Monday preceding the Sunday on which the wrongs claimed in the suit were perpetrated upon Collins by Temple and Gilbert. On Wednesday preceding this Sunday there had also been a discussion between Collins and Temple about signing the deed of trust and note. Their testimony differs as to what occurred on this date. Collins was permitted to state that the discussion was unpleasant, but not to go into details; while Temple denied that the discussion was unpleasant. It appears from the testimony of Collins

that he declined to sign, and also that property was included in the deed of trust which he did not own, having already disposed thereof. There seems to have been further discussion on the Saturday preceding the day upon which the alleged wrong was committed; on which date Collins and Temple went to the office of the Chancery Clerk to examine records in regard to the property, and the ownership thereof; and it was then discovered by Temple that a transfer or assignment had been made by Collins. According to Temple, he requested Collins to meet him at his office at eight o'clock Sunday morning, to discuss the matter with him and Gilbert, who was the general manager of White's Lumber & Supply Company, and also of other allied corporations; and that he agreed to do so. Gilbert came over Sunday morning, reaching Meridian about half past eight, but Collins did not appear. He denied having agreed to meet Temple and Gilbert at the office of the former. About half past ten or eleven o'clock, Collins not having come to the office, Temple and Gilbert went to his residence, several blocks distant from the office, to see him, and came upon him near his home, conversing with one, Ben Harris, a neighbor. There is a difference in their versions of what happened.

According to the testimony of Temple and Gilbert, they invited Collins to get in their car, that they might discuss the matter; and driving to a point about half a mile from Collins' place they left the main highway, and turned into a place where there was a side entrance to the road, but which seems not to have been a road or highway—what one of the witnesses described as a "lover's lane;" and there, according to Temple and Gilbert, they discussed the matter with Collins at some length. Collins refused to sign the note and deed of trust, prepared as stated above. He had secured from the lumber company materials for a building which was being completed, and had contracted for another building; and when he refused to secure the debt claimed to

be owing by him to the lumber company, they proposed that he transfer to the lumber company his contracts for constructing the said buildings; and made an appointment for Collins to meet them at the office of the attorney for the lumber company on the following morning, to make the assignments. The testimony of Gilbert and Temple indicated no use of force, or threat of violence or effort to coerce Collins in any way, but merely a conference, seeking to adjust the matter, and to secure the execution of the deed of trust mentioned.

The testimony of Collins, corroborated in part by other witnesses, was to the effect that Temple and Gilbert drove up to a place near his home, where he was talking with a neighbor, Ben Harris, and asked him to get in their car, as they wanted to talk with him; that Harris suggested to Collins that he should not comply. Collins went on to his home, and Temple and Gilbert drove up in front of his home and called to him; and on his going out they invited him to get in the car in order to discuss the matter, which he did; whereupon they closed the door and drove rapidly away, over his protest, refusing to let him get out, and carried him to a point away from the highway and passers-by; and there undertook to procure his signature to the note and deed of trust, assaulting him, and using threatening language and gestures.

Mr. Collins relates the occurrences, in part, as follows:

"Q. Just tell the jury what was happening there, and what was said?" "Well, Mr. Temple says, 'Mr. Gilbert got up this morning and drove all the way over here from Jackson to talk to you about this little matter,' and he says, 'It seems you and me can't settle it and I want you just to talk with him a little bit about it.' I says, 'All right, I will be glad to talk to you, be mighty glad. I believe you are a fair man, be glad to talk with you, just whatever you want to ask, or suggestions, just go ahead with it.' I says, 'I don't feel like staying up; I am sick this morning. I just been down to get some medicine, but if we can't get together, I believe me and you can.'

He says, 'Get in here.' I tried to get in that door. It wasn't open. I come around to that side. I got in and started to sit down. Time I sit down they started.''

"Q. Did they start slow?" "No, sir: they started fast, due north. Well, I tried to get out and I couldn't, and this fellow Gilbert grabbed me and shoved me down. Then he held around the door. The glass was down. And they drove about a mile in a northeasterly direction on the old Marion road. Then they left the road and went north about a hundred feet, around in behind some bushes as far as they could go with an automobile at that time, and parked. And he says, 'Well, I reckon, God damn you' ''—

"(Interposing) Who said that?" "Mr. Temple. He says, 'Well, I reckon, God damn you, you are surprised.' I says, 'Well, yes and no.' He says, 'Just what do you mean by that?' I says, 'I am not at you, but I am at Mr. Gilbert.' And he says, 'Well, you can leave your wife, you can leave your boy, you can leave your home, you can leave everything in the world but Miller Collins.' and he says, 'We have got Miller Collins this morning.' and he says, 'We are going to tell you what you are going to do, not what you ought to do and better do, but we are going to tell you this morning what you are going to do.' He began to talk to Mr. Gilbert. He says, 'Mr. Gilbert, I have asked him to sign a little mortgage on his place.' He says, 'He has refused to sign it.' I says, 'Yes, I have, and I refused to do it because I haven't put any contracting money in that. I paid for it with my bonus money, and I am not going to give you a mortgage on it.' He says, 'Yes, you are going to give me a mortgage on it.' I says, 'Mr. Gilbert, you look like a fair man.' I says, 'Let's take this thing to law. That's the only fair way.' I says, 'I will go down, get me a lawyer—I haven't got one, but I will go down and get one, and I would just like to hear what twelve men and the law say about this.' Well, you just as well hit him or something. He jumped out of the car, pulled his coat off, opened the door, looked,

me in the face, and says, 'God damn the law,' . . .
He says, 'You haven't got twelve men in Lauderdale
county against us, because they all owe us, and as far
as a lawyer is concerned, you haven't got a one worth a
damn not getting paid by the month, all you can get.' ''

"What did Mr. Temple then do?" "He turned around
on the back of the seat, turned around on his knees, fac-
ing me direct in the back of the seat. I was in the back
seat of the car. He was under the steering wheel. He
turned from under it, facing me, He laid this same deed
of trust and mortgage over in my lap, and he grabbed me
in the collar, and he come over with a knife, and he says,
'Now you sign it,' and he started tapping me over the
head with that knife in his hand. And this man Gilbert
says, 'Now you sign it.' ''

"Did he strike you with the point of the knife?" "No,
sir."

"What in addition to catching you, as you say, in your
bosom here or collar . . . Did he lay hands on you
at any other place?" "Yes, sir."

"Where did he lay hands on you?" "On the top of
the head, because I had slid so far down in the seat was
the only way he could get to me."

"Well, what did he do?" "He hit me over the head
with the back of his hand, with a downward blow, like
that."

Objection made, and the court ruled that the testimony
as to striking would have to go out under the charges
of the declaration.

The testimony of witnesses for Collins was to the ef-
fect that when he got in the car and started moving off,
Ben Harris, who was nearby, went to the door of Collins'
home to inform Mrs. Collins, but failing to get a response
to his knock, went on to another place where he was to
take dinner with a friend. Mrs. Collins seems to have
become apprehensive, got in her car and started to fol-
low, but, as she testified, failed to locate her husband,
Temple and Gilbert. She then went for Mr. Harris, and

he joined her, whereupon they proceeded in the direction in which the parties had gone. They found where the car had turned off the Marion road, and followed it until they were near. Mr. Harris testified that he got out and went to the car of a Mr. Pryor, who had also come along, to see if he had a gun. Harris testified that he saw Temple brandishing a knife in front of Mr. Collins. Upon the arrival of Mrs. Collins and Harris, according to the testimony of Collins' witnesses—himself, Mrs. Collins and Ben Harris—Temple and Gilbert got into their car and drove rapidly toward town.

Mr. Collins testified that when these parties came up, Mr. Gilbert said, ''Let's take him to the office, they can't come there,'' and that they went in the direction of the city, followed by Mrs. Collins and Harris; and that just before they reached Collins' home Mrs. Collins sped by them in her car and blocked the road in front of the home, and they then let Collins out of the car. These statements are disputed by Gilbert and Temple, who claim that they drove back, stopped in front of Mr. Collins' house, and let him out; they denied that Mrs. Collins sped in front of them and blocked the way.

There is also evidence by Collins as to threatening statements made by Gilbert, which are denied by Temple and Gilbert. It appears from the evidence that on the following morning Temple and Collins went to the office of the attorney for White's Lumber and Supply Company, and there executed an assignment of the contract for the two accounts mentioned in a foregoing statement; and that there was nothing said in the office in reference to the matters of the preceding day.

Temple testified that he took Collins in his car to this office—that they went together; and that Collins voluntarily signed the assignments of the said contracts.

There was a sharp dispute between Collins on the one hand, and Gilbert and Temple on the other, as to whether or not the note and deed of trust were in the car at the place to which they carried Collins; Collins testifying

that they produced the note and deed of trust, laid them on his lap, and tried to force him to sign, while they deny having the deed of trust there at all, and Temple states that Collins was in possession of the note and deed of trust prior to that.

Mrs. Collins testified that on Monday, or at some time, shortly after the Sunday in question, Temple called her on the telephone, and asked her to have Collins return the note and deed of trust to him. This Temple denies. He testified that he did not know anything about the matters complained of by Collins, or testified to by him; about any tort committed on said Sunday until he was served with summons in the latter part of September in connection with this suit.

It also appears that the White Lumber and Supply Company filed a suit against Collins about the time of the service of process in the suit against the lumber company and Temple.

It is, of course, difficult to state all the pertinent and voluminous testimony in a suit of this kind, but the foregoing represents the gravamen of the testimony.

When the cause came on for trial, and the arguments were finished, it was near night fall. The jury retired, the Circuit judge directed the sheriff to notify him if the jury returned a verdict, and when later, during the night, the jury came into court, or asked to report, the Circuit judge was recalled to the court room, the jury was brought in and asked by the judge if they had arrived at a verdict. Several of the jurors shook their heads, and one, a Mr. Bidgood, according to some of the evidence, asked the judge, ''Can a verdict—'' whereupon the judge directed them to return to their room for further deliberation.

The lumber company was represented by a firm of lawyers, Temple having another lawyer; but all seems to have been conducted as a joint effort, the suit being a joint suit. A member of the firm representing White's Lumber & Supply Company was present in the court

when this happened, and testified that the above statement by the juror was what he recollected, and that he made no request of the court at that time.

Mr. Gipson, representing Temple, was not present. He had asked a deputy sheriff to telephone him if the jury reported, but through oversight this was not done. No request was made of the Circuit judge to that effect, but it was shown by his testimony that it was customary in such cases to notify counsel when the jury were ready to report; that he observed that one of the attorneys participating in the cause was present.

According to the juror, Bidgood, the jury had agreed to request the court to inform them if they could return the verdict against the lumber company, and not against Temple; and his recollection was that he asked the Circuit judge for further instructions, and that the court directed them to return to their rooms—that he could not give them further instructions, or words to that effect. The Circuit Judge made a statement that it was his conception of the law at the time that he could not give instructions after the jury retired—that he was not requested to do anything in the matter. And he overruled a motion for a new trial.

The testimony of the juror, Bidgood, was to the effect that after the judge directed them to return, as soon as he smoked a cigarette, they re-wrote the verdict, returning it against both defendants in the cause. The testimony of this juror was incompetent. A member of the jury cannot impeach its own verdict, nor can he testify to matters which show that the verdict returned was not the verdict of the jury. No reversible error can be predicated upon the failure of the judge to do anything at the time; the instructions given the jury were ample for their guidance; the judge could not have given additional instructions under the statutes of this state, without being requested to do so by the parties or their attorneys; and this was not done.

We think a study of the testimony, as disclosed in the above statement, and as contained in the record, would show ample evidence to sustain the verdict as to Temple, who was, of course, responsible for his own acts, whether acting for himself or for White's Lumber & Supply Company. The jury had a right to believe the testimony for the plaintiff. They also had a right to accept, if they believed it to be true, the testimony on behalf of the defendants. It was a case entirely for the jury to settle, on conflicting proof. A jury is supposed to be composed of men of good intelligence, sound judgment and fair character; and the attorneys participating in this suit are veterans of the Bar, having practiced in the county for many years, wise in planning and skillful in trials and possessing tongues well trained in the art of persuasion. They may be assumed to have been acquainted with the jurors and parties to the suit, and to have had knowledge of all the facts brought out. It is difficult to believe that, on the facts of this record, the jury did not act in good faith. The question would depend largely upon the standing of the witnesses in the court and in the community; and we are unable to say that there was any bias, prejudice or passion influencing the jury.

It is also contended, on the suggestion of error, that the court should have granted an instruction to the defendants, that if they did not believe the note and deed of trust were present at the place where the above-mentioned discussion occurred on Sunday, they should have found for the defendant; the controlling fact is not whether the note or deed of trust were present; but whether Temple abused and sought to coerce or intimidate Collins into signing the paper; and whether he and Gilbert were hostile and threatening in their attitude toward him. The question as to whether or not the note and deed of trust were actually present would, of course, have its effect upon the veracity of the witnesses; but the

tort could have been committed, on the facts, whether the note and deed of trust were there or not.

The suggestion of error is overruled.

Suggestion of error overruled.

**McGehee, J.**, delivered a dissenting opinion, on Suggestion of Error.

As will appear from the former opinions, this cause was reversed and remanded for a new trial as against the appellant, White's Lumber & Supply Company, and was affirmed as to the appellant Fred D. Temple, but in which affirmance only three of the judges concurred.

The facts of the case upon which the affirmance as to Temple is predicated have not heretofore been stated, and in my opinion they will not sustain the judgment of affirmance for the reason that the testimony on behalf of the appellee, as plaintiff in the court below, is wholly unreasonable and unbelievable. In contending that a judgment, based upon the verdict of a jury on a controverted issue of fact, should be reversed and a new trial granted, I feel that I should state my reasons for so doing. In the former dissent, from the affirmance as to the appellant Temple, I merely stated my position, briefly, as follows [191 So. 110]: "I am also of the opinion, shared by two of the other judges, that the case should be reversed and remanded as to the individual defendant, Temple, for the reason that the verdict is against the overwhelming weight of the believable testimony."

In taking the position that an inherently incredible story is not made credible by being sworn to, and that it should not be allowed to serve as the foundation for a verdict, I am amply supported by the former decisions of this Court, as announced in the cases of Teche Lines, Inc., v. Bounds, 182 Miss. 638, 179 So. 747; Yazoo & M. V. R. Co. v. Lamensdorf et al., 180 Miss. 426, 177 So. 50, 178 So. 80; Davis, Director General of Railroads v. Temple, 129 Miss. 6, 91 So. 689; and Yazoo & M. V. R. Co. v. Skaggs, 181 Miss. 150, 179 So. 274, and numerous other

cases. This view was approved and emphasized in the case of Teche Lines, Inc., v. Bounds, supra, wherein it was said [182 Miss. 638, 179 So. 750]: "Courts are not required to believe that which is contrary to human experience and the laws of nature, or which they judicially know to be incredible . . . although there may be evidence tending to support it."

Appellee's fantastic story of having been kidnaped, abducted and assaulted by two experienced business men, who have for several years held important and responsible positions as managers of retail lumber and supply yards, in an effort to compel him by threats and a drawn knife to sign a deed of trust, on Sunday, on a homestead, the title to which was known to them to be then vested in his wife, who was not present to join therein, and when no officer was available to take the acknowledgment, is to my mind so wholly unreasonable and unbelievable, and contrary to the overwhelming weight of the credible testimony in the case that it should not receive the sanction of any court. It is obvious that a mere statement of such a contention carries its own refutation; that it is ridiculous and absurd should require no argument.

The appellant corporation held a claim against the appellee for approximately $1,800 covering an indebtedness alleged to be due it for lumber and other building materials furnished him as a building contractor. The appellant Temple, as local manager of the corporation, sought to obtain security for the account, which was long past due, before making further advances. A deed of trust was prepared and delivered to him on Monday prior to the alleged abduction and assault. On the following Saturday, appellee made it known to the appellant Temple that he could not execute the deed of trust for the reason that it embraced some property that he no longer owned, and for the further reason that neither he nor his wife were willing to give security on the homestead which he had recently conveyed to her. There-

upon, they went to the courthouse to check the description, and then Temple discovered that the appellee had made an assignment or conveyance of all his property to his wife. Temple testified that he then prevailed on the appellee to agree to meet him on the following Sunday morning at the office of the appellant corporation for a conference in regard to the status of this indebtedness, at a time when L. C. Gilbert of Jackson, the general manager of the several lumber yards owned by the appellant corporation, could be present. The appellee denied having agreed to the conference, but the testimony showed without dispute that Gilbert left Jackson early that Sunday morning and reached the office at Meridian at the appointed time, about 8 o'clock A. M., and that he and the appellant Temple remained there nearly three hours waiting for the appellee to keep such an engagement. The note and deed of trust still remained in the possession of the appellee according to the testimony of Temple. They finally drove out to the home of the appellee, found him near the house, and induced him to get in the car with them in order that they might discuss the status of the appellee's indebtedness and reach some conclusion in regard to future advances. From the house they drove down the road, evidently for the purpose of discussing the matter with him out of the presence and hearing of the family, and stopped the car some little distance from the house, where the appellee claims that the assault occurred. He then claims that while he was seated on the rear seat of the car, the appellant Temple placed the deed of trust in his lap, drew a knife and cut at him within "an inch or an inch and a half" of his face and commanded that he then and there sign it.

Picture if you can one of these two business men, of several years experience as managers of retail lumber yards, suggesting to the other on that Sunday morning, at the office of the lumber yard at Meridian, after having waited for hours for the appellee to keep his engagement, that the deed of trust be taken out to his home for the

purpose of intimidating and compelling him to execute it, when they necessarily knew it would not be worth the paper on which it was written, for numerous reasons. Then, also picture if you can the appellee agreeing at the time of the alleged assault that he would come to town the next morning and execute an assignment of a building contract which the appellant corporation had agreed to finance for him, and then imagine him going to the office of a local attorney on the next morning with the appellant Temple, where they waited for the assignment to be prepared, conversed freely in regard to the transaction before the assignment was executed, and without any mention being made by the appellee to the attorney or to anyone else in regard to the alleged malicious assault on the day before.

The jury itself evidently did not believe that Temple had assaulted the appellee, for we find that this record discloses on the hearing of a motion for a new trial that before rendering the verdict against both of the appellants the jury had come into open court to seek further instructions, at a time when the appellant Temple's attorney was absent under an agreement with a deputy or bailiff that he was to be notified when the jury was ready to report, and from which hearing on the motion for a new trial it appears that the object of the jury in seeking the further instructions was to ascertain whether or not they could render a verdict exonerating Temple and finding against the corporation. It further appears that a verdict to that effect had been prepared and would have been returned if the jury could have obtained a favorable instruction as to its right, or rather as to its power, to do so. In other words, it appears that the jury was unwilling to render a verdict against the appellant Temple until after the jurors were directed to return to their room, without being given further instructions. Thus it appears in this record that the jury either did not believe the appellee's story as to the conduct of the appellant Temple, or that the jury was willing to render

a verdict against the corporation alone without regard to whether Temple had been guilty of the tort complained of, on the theory that the corporation was protected by liability insurance—an issue which had been improperly injected into the case on behalf of the appellee. In either event, the defendants were entitled to a new trial. If I should be mistaken in the view above stated, then there is presented the further consideration that the damages awarded were largely, if not altogether, punitive in character, and the verdict of approximately $3,000 would in all probability be highly excessive as to the appellant Temple, as salaried employee of the appellant corporation, since it would doubtless amount to a complete confiscation of any and all assets that he may own. It is always permissible to show the financial worth of a defendant in cases where punitive damages are to be allowed, and although the record sufficiently discloses that the verdict may not be excessive as against a corporation that owns several retail lumber yards, still it should not be permitted to stand as against the individual defendant without some proof of its reasonableness as a punishment, in the light of his financial circumstances, and especially in view of the fact that the jury would not have administered a punishment so severe, if any at all, against the appellant Temple, if it had known of its power to exonerate him without likewise returning a verdict in favor of the corporation.

Moreover, since the suit was predicated by the declaration on an alleged assault of the appellee by Temple in an effort to then and there coerce him into signing the deed of trust on the occasion complained of, and since the testimony on behalf of appellee sought to establish such a contention, the appellants were entitled to the refused instruction in the following words ''The Court charges the jury for the defendants that the burden of proof in this case is upon the plaintiff to show to the satisfaction of the jury by a preponderance of the evidence that the note and deed of trust testified about was handed over to

the plaintiff, Collins, by the defendant, Temple, on the 13th day of June, 1937, and that the said Temple then and there undertook to coerce and force the plaintiff to sign said instrument and unless the jury believe from the preponderance of the evidence that the said note and deed of trust was then and there in possession of the said Temple and was so delivered unto the said Collins to be then and there signed by him, then under their oath, the jury will return a verdict for the defendants''.

This was the case sought to be made by the plaintiff's testimony. Unless the jury believed that the note and deed of trust was there, then they could not believe that Temple placed it in plaintiff's lap and that he struck at him with a knife ''within an inch or an inch and a half of his face'' in an effort to make him sign. It was the contention of the defendants that the deed of trust was in appellee's possession all the while from the day it was prepared and delivered to him on Monday, June 5th, until the day of trial when he produced it in court. This instruction presented their theory of the case; and which, if true, excluded any possibility of their having kidnaped and abducted plaintiff in an effort to force him to sign it on that day by the use of force and violence. In other words, unless the plaintiff's story was true, he was not entitled to recover, and this instruction fairly and correctly presented that issue.

Except to the extent that Gilbert and Temple went to the home of the plaintiff on that Sunday, and induced him to go down the road with them (where they could talk with him out of the presence and hearing of his wife who was already known to be hostile to their request for the security) in an effort to persuade him to come in on the following day and adjust the matter, it is manifest that the plaintiff's story was fabricated in an effort to defeat the claim of $1,800 held by the appellant corporation against him and on which claim suit was brought four days prior to the filing of this suit by him.

In Teche Lines, Inc., v. Bounds, 182 Miss. 638, 179 So. 747, it is shown that this Court has demonstrated, in recent years, an increasing unwillingness to accept unreasonable testimony as a basis for a verdict, wherein it was said: "If there be any one thing in the administration of law upon which the decisions, the texts, and the general opinion of bench and bar are in agreement, it is that evidence which is inherently unbelievable or incredible is in effect no evidence and is not sufficient to sustain a verdict. . . . the overwhelming weight of authority throughout the country is that believable or credible evidence in civil cases is that which is reconcilable with the probabilities of the case, and that bare possibilities are not sufficient. Where evidence is so contrary to the probabilities when weighed in the light of common knowledge, common experience, and common sense that impartial, reasonable minds cannot accept it other than as clearly an improbability, it will not support a verdict."

No other witness claims to have seen Temple assault or strike the appellee, or otherwise undertake to compel him to sign a deed of trust. Nor does anyone claim to have seen such an instrument of writing at the scene of the alleged quarrel—regarding his refusal to come to town and execute the security requested—although others appeared at the scene; and he is corroborated only as to the setting of the story out of which the complaint arose. Furthermore, testimony seeking to support the essential features of an inherently incredible story, if there had been such testimony, would itself likewise be incredible. No man possessed of sufficient common sense and experience in business affairs to enable him to operate a retail lumber yard would undertake, in the presence of his superior officer, to obtain the execution of a deed of trust on Sunday, by the husband, on a homestead belonging to the wife, and in her absence; and this too, by the use of threats and a knife. Nor would such superior officer approve or condone such nonsensical conduct. That fact, in my opinion, we judicially know.

Finally, it may be observed that the affirmance of this case as to the appellant Temple and its reversal and remand as to the appellant Corporation brings about an anomalous, if not a unique, situation. The corporation is awarded a new trial because three of the Judges are of the opinion that the appellee's story as to what was done by the appellant Temple, as agent of the corporation, is contrary to the overwhelming weight of the believable evidence, and because another one of the Judges is of the opinion that the corporation is not liable on a different ground; whereas, the case is affirmed as to the agent on the same facts on which the corporation is to have a new trial, notwithstanding that the controlling opinion of the Court holds that no error was committed against either of them on the former trial. Again, the judgment against the appellant Temple and the sureties on his appeal bond will become final, and will have to be paid, before the mandate of this Court as to the appellant corporation can reach the lower court for a new trial, and there will then be nothing left to try as to the corporate defendant, since there is no contribution between alleged tort feasors, and payment by one accrues to the benefit of all. If, therefore it should appear upon a new trial that the judgment against the alleged tort-feasor Temple has been paid, there could be no further assessment of damages, and no judgment could be rendered upon which the corporate defendant could call upon the insurance company for reimbursement. In fact, the appellant corporation will not have been damaged by being required to pay a judgment. It will have already been paid by the appellant Temple and his sureties, and with the result that the litigant sought to be punished by the jury is to go free. Manifestly, if the case is to be reversed and remanded as to the appellant corporation it should likewise be reversed and remanded as to the appellant Temple. For obvious reasons, no suggestion of error is filed by the former; and in my opinion it should be sustained as to the latter.

**Anderson, J.,** concurring that the suggestion of error ought to be sustained to the extent of giving Temple a new trial.

I agree now as I did originally that Temple, as well as the Lumber Company, is entitled to a new trial on the weight of the evidence. Both, however, come very close to being entitled to a directed verdict. In fact, the line of demarcation between a directed verdict in this case, upon the ground that appellee's evidence is so unreasonable as to be unbelievable, and a new trial on the weight of the evidence is almost invisible. My best judgment, however, as stated, is in favor of the latter.