**RALSTON PURINA COMPANY,**
Plaintiff,

v.

**COMO FEED & MILLING COMPANY,**
Defendant,

v.

**Jim BAKER et al., Garnishees.**
**No. D–C–21–60.**

United States District Court
N. D. Mississippi,
Delta Division.

June 30, 1966.

L. G. Fant, Jr., Holly Springs, Miss., and W. H. D. Fones, Memphis, Tenn., for plaintiff.

McClure, Fant & McClure, Sardis, Miss., Roy Johnson, Senatobia, Miss., and W. E. Wilroy, Hernando, Miss., for garnishees.

MEMORANDUM OPINION

CLAYTON, Chief Judge.

On judgment heretofore obtained by Ralston Purina Company in this court against Como Feed & Milling Company, writs of garnishment were issued against many who plaintiff claims were indebted to Como on accounts receivable. As responsive pleadings came in, these garnishees, all of whom denied the claimed indebtedness, were classified for consideration of consolidation of those within each class for separate trials for each such class. The cases as to twenty-eight such garnishees, which were thought to be in the same posture as to pleadings and issues, were consolidated for trial at the same time to one

jury. During the course of this trial, the case of one such garnishee (R. E. Spier) was eliminated from the consolidation when it developed that his case was different from those of the other twenty-seven.

At the close of all the evidence, Ralston moved for a directed verdict, but the court submitted the issues to the jury. Verdicts were for the garnishees and judgment was entered thereon.

Now Ralston's timely filed motion for judgment notwithstanding the verdict or, alternatively for new trial, is for disposition on briefs of the parties. Rule 50, Federal Rules of Civil Procedure.

Severely abbreviated, the facts follow. Open accounts against garnishees appear in a separate or special accounts receivable ledger of Como for feed and other such supplies received from Como by garnishees and used by them in the production of eggs (from breeder hens) which were delivered to Como by garnishees for sale by Como for credit to be given garnishees on said accounts for the proceeds of such sales. When such credits exceeded such an account, the excess was payable to the garnishee. Another "regular" accounts receivable ledger was kept by Como. Entries were regularly made of items affecting both the "regular" accounts receivable ledger and the special or separate accounts receivable ledger, before posting, in the same journal.

Como is a Mississippi corporation with an authorized capital of $60,000. No by-laws of the corporation are in evidence. Como was engaged in selling (perhaps processing to some extent) at what is considered a retail level, feed and related products for cattle, livestock and poultry.

Ralston's theory is that the merchandise represented by the accounts receivable against garnishees was sold to garnishees by Como in the regular course of business and that these accounts are therefore unequivocally debts owed by garnishees. Its evidence in chief on trial consisted of the Como corporate charter and certain written documents, some reflecting dealings between Ralston and Como and the testimony of an accountant about the bookkeeping system employed by Como and the accounts in question here. The accountant, who did not work for Como but posted and balanced Como's books, personally knew nothing about the various transactions involved in this controversy. He worked from invoices and other such data furnished to him by Como. No officer, director or full time employee of Como was called as a witness.[1]

Ralston called two witnesses on rebuttal who had been employees of Ralston during the time with which we are concerned and who knew of the Como breeder hen program and were concerned with and working on it. Each of them had conferred with some of the garnishees, but neither one testified about any damaging admission or statement by any garnishee. One of them testified that when the breeder hen program first began, the Como accounts receivable arising therefrom were kept, along with Como's other such regular accounts, in Como's regular accounts receivable ledger, but that Como began keeping the breeder hen accounts receivable in a separate ledger at Ralston's request to facilitate identification thereof for assignment to Ralston as a part of the financing of Como's part in this program by Ralston.

Garnishees' theory is that these accounts came into being during the life of a "breeder hen" program, promoted by Ralston through Como with garnishees

---

1. The president and general manager of Como was in attendance at the trial under process. He was not called as a witness by Ralston or by garnishees nor was any deposition by him offered. In argument to the jury, counsel for garnishees commented on Ralston's failure to call him as a witness. Ralston's objection thereto was sustained and the jury was instructed to draw no inference unfavorable to Ralston on this account, since this witness was equally available to both sides of the case.

under which, so far as pertinent here,[2] garnishees were to build and maintain a specially designed chicken house for each 1000 chickens, pay the cost of water and utilities, furnish their own time and labor and such other labor as might be necessary to feed, water and care for the chickens, keep the chicken houses clean and gather the eggs, pack them in special cartons and deliver or pay the expense of delivery of the eggs to Como. And, say garnishees, Como was to furnish hens, feed and other materials to garnishees and sell the eggs produced, with the proceeds of such sales to be used to pay for the feed and other materials furnished by Como, after which all excess would be used to reimburse garnishees for their labor and expense and to retire the loans for the construction of the chicken houses.

To this point there is little material disagreement. But here, as has been said, Ralston says the merchandise went to garnishees from Como on the usual open account basis with the accounts to be paid by garnishees without regard to whether the sale of eggs produced enough money for that purpose or not, while all garnishees testified (or were stipulated to testify) that if the proceeds of the sale of the eggs was inadequate to pay the full amount of the garnishee's special "breeder hen" account with Como, then Como would absorb the difference and it would not be a debt owed by a garnishee.

Factually the jury decided this issue for garnishees.

The main thrust of Ralston's argument is that all negotiations and agreements on behalf of Como were by its president and general manager and that, if even in fact he agreed for Como in the way garnishees say, such agreements, as a matter of law, were not binding on Como since they were outside the ordinary course of this corporation's business and *no special authorization*

*was given by the board of directors for these undertakings.*

A short, over-simplified answer to the contention that the directors did not give such special authorization is to say that the evidence by stipulation shows only that the corporate records of Como do not show that such specific authorization was given. Thus, the evidence here leaves this question open, i. e., the directors could have considered the question without making any written record, and could have declined to give such special authorization because (1) they did not want to go into a "breeder hen" program at such a risk, or (2) they did want to go into the "breeder hen" program on the proposed basis but felt that the president and general manager had authority to act for the company without any special authorization. Or, they could have given all necessary authority. Moreover, the directors could have considered the question and could have followed any of the foregoing courses of action, making a formal written record of their action and this record could thereafter have been lost or destroyed.

Accepting, arguendo, the finding of the jury that Como's president and general manager did act and agree for Como as garnishees testified he did, it must be borne in mind that it is stipulated that he had general authority to bind Como, and that the charter of this corporation gave it explicit authority "to engage in the chicken business and to do any and all things incident thereto." Como's participation in the "breeder hen" program, on whatever basis, was participation in the chicken business. Only Como's agreement to absorb (or hold garnishees harmless from payment of) the difference between the proceeds of the sale of eggs and the amount of garnishees' special "breeder hen" account is seriously questioned by Ralston as being outside the ordinary course of Como's business. This is not such an ex-

---

2. Ralston, a manufacturer or processor of feed for cattle, livestock and poultry, was to furnish feed and other materials to Como and assist in arranging financing for garnishees' investments necessary for them to enter the program. Ralston's judgment against Como arose from this program.

traordinary or unusual activity for a feed retailer as Ralston would have this court believe. See, for example, the Louisiana case of Harper v. Jones, La.App., 126 So.2d 857 (1961). The facts are identical with the case here except broilers instead of eggs were the end product and the dealer was an individual rather than a corporation. Suit was by the dealer against the grower on what was claimed to be an unconditional sale and delivery of chickens, feed, supplies and incidentals for the raising of broilers for sale by dealer for grower's account, with the net above dealer's account to go to grower. Grower's version was that he could lose only his time, labor and cost of utilities if the proceeds of the broiler sales were insufficient to pay dealer. Grower's version was corroborated by several witnesses (just as are garnishees here) and the grower prevailed.

Ralston's principal reliance on Stoneman v. Fox Film Corporation, 295 Mass. 419, 4 N.E.2d 63, 107 A.L.R. 989, (which was relied on greatly at trial) is misplaced. At best it would merely be persuasive and it is distinguishable on its facts from the case here. There were bylaw restrictions there and no bylaws in evidence here. There were statutory restrictions there not present here. There the evidence was unequivocal that the president of defendant corporation had no special authorization to act for the corporation in the leasing transaction which he undertook and the magnitude and character of the undertaking were clearly outside the "usual and necessary (activities) in the ordinary course of the corporate business." Finally, defendant Fox never accepted the proposals and never entered into performance of a contract. Here Como and garnishees did enter into performance of a contract and continued with such performance until radical downward changes in market prices for eggs forced abandonment.

It is more appropriate here to say that in the circumstances shown to exist, it is normal to presume that Como's president and general manager in acting for Como (as the jury found he did) had explicit authority from Como so to do, but that the directors failed to make a record thereof, or that such record, if made, was destroyed or lost. This view is clearly in line with such cases as Burnett's Lumber and Supply Co. v. Commercial Credit Corporation, 211 Miss. 53, 51 So.2d 54 (1951), in which, among other things, it is said:

We are not impressed with the contention that Sessions had no authority simply because it was not shown by the written minutes of the directors' meeting. "It is to be implied that corporations keep records of their doings; but as a general rule, the failure or neglect of the proper officer of a corporation to keep a record of its acts and resolutions cannot affect the rights of third persons dealing with it. The action of the directors of a corporation is binding on the corporation, though no record of their action was made." 13 Am.Jur., Corporations, § 166. "Ordinarily, a board of directors acts through formal resolution or motion recorded on its minutes. A written entry or record of its action is not necessary to give validity to its proceedings; if its proceedings are not recorded, the action may be shown by parol." Id. Sec. 948.

In the recent case of White's Lumber and Supply Company v. Collins, 186 Miss. 659, 674–675, 191 So. 105, 107, 192 So. 312, this Court said "The powers of a general manager of a corporation, *insofar as concerns third persons without notice to the contrary*, are coextensive with the carrying on as a going concern of all the business of the company. Allen Gravel Company v. Nix, 129 Miss. 809, 93 So. 244; Lake Shore & M. S. R. Company v. Pierce [Prentice], 147 U.S. 101, 114, 13 S.Ct. 261, 37 L.Ed. 97, 103." [Emphasis added.]

■ To the garnishees, whose version of the arrangements with Como is uncontradicted, the president and general manager *was Como*. In the circumstances

here he had full authority to act for and bind Como.

Now to the question raised by Ralston with respect to R. E. Spier. He was included in the consolidation order which was the basis for the trial now in question upon the mistaken belief that his position was identical with the positions of the other twenty-seven garnishees who were also named in that order. He testified *as a witness for himself.* During cross-examination, which was out of the presence of the jury, it developed that he had signed, after termination of the "breeder hen" program, what appeared to be an unconditional acknowledgement of his indebtedness to Como and an agreement to pay Como for the balance of his "breeder hen" account which he said was signed as the result of an effort on his part to make some use of his empty chicken houses by re-entering the chicken business and paying Como a part of the profits therefrom on the "breeder hen" account. He also stated that he countermanded this paper before any action had been taken pursuant thereto and that it remained lost in Como's files until produced in court that day (which was the second day of the trial).

When this material difference as to his case from the cases of the other garnishees became known, the court eliminated him from the consolidation order and so instructed the jury.

Complaint is made by Ralston, apparently of this action, by saying that the rejection of the written acknowledgement of indebtedness was prejudicial to Ralston and they attempt to present Spier in the same light *as if he had been offered as a witness by plaintiff.* Such is not the case at all. He took the stand as a witness for himself alone. He was eliminated from the consolidated trial because his case was unlike the other twenty-seven cases. This is all the court did about Spier and his case. *He was never offered as a witness by Ralston.*

█ Counsel for Ralston well knew that the court had undertaken to classify the cases of all garnishees by separating them into groups composed of identical cases for the purpose of consolidating those cases in each group for a single trial. When they learned (even late in the trial) that the Spier case was different, it then would have been proper for them to promptly inform the court so that a decision could then have been made, before Spier took the stand as a witness, as to whether Spier and his case would or would not be eliminated from the consolidated trial. This was not done and Ralston cannot now complain.

Applying the two different yardsticks which are proper here because of the alternative aspects of Ralston's motion [2B Barron & Holtzoff Federal Practice and Procedure (Wright Ed.) §§ 1075, 1079 and 1080], it is apparent from what has been said heretofore that neither the motion for judgment notwithstanding the verdict nor the alternative motion for a new trial is well taken.

Order is being entered to deny and overrule Ralston's motion in its entirety.