605 So.2d 38 (1992)
W.J. RUNYON & SON, INC.
v.
Steve L. DAVIS.
No. 89-CA-1284.
Supreme Court of Mississippi.
July 22, 1992.
As Modified on Denial of Rehearing August 19, 1992.
*39 Suzanne N. Saunders, Sheila Roberts Fortenberry, Saunders Bell Fortenberry & Corson, Patricia Trantham, Jackson, for appellant.
Crymes G. Pittman, Joseph E. Roberts, Jr., Cothren & Pittman, Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
ROBERTSON, Justice, for the Court:

I.
This case arises from a serious motor vehicle accident. One seemingly central issue is whether a highway subcontractor is liable, vicariously, for the conduct of its asphalt hauler truck driver. The Circuit Court answered in the affirmative and instructed the jury accordingly, and thereafter entered judgment on the substantial damage award the jury returned.
We affirm.

II.

A.
Back in the early 1980s, Highway 61, north of Vicksburg, was but two lanes. The State decided the highway should be four-laned but instead of expanding the existing highway, the Highway Department proposed to lay a new roadbed and construct two separate lanes, separated by a median strip from fifty to seventy feet in width. The new lanes would ultimately carry southbound traffic toward Vicksburg. In July of 1985, Key Constructors, Inc. held and was performing a contract to complete a four and a half mile section of the new southbound lanes, including the bridge work, dirt, base and paving work. Key had subcontracted out the base paving work to W.J. Runyon & Son, Inc., Defendant below and Appellant here.
*40 July 11, 1985, was a hot, dry, dusty summer day. Nearby convenience store owner Roy Safir walked outside and said he could taste the dust. "When the trucks would come through, the dust would get thicker." Adjacent resident Cathy Shows said sometimes the dust was so bad when the school bus came she could not see the bus until it stopped at the driveway. It was in this setting that Runyon was laying asphalt on the new roadbed, to the west of the existing two-lane highway. The job site was serviced by seven or eight asphalt dump trucks Runyon had engaged, each of which loaded at Runyon's hot mix plant south of Vicksburg and then traveled to the construction site north of town. Runyon laid about 100 tons of asphalt an hour  about four or five truckloads an hour. While on the new roadbed and traveling back and forth to the existing roadways, these trucks kicked up considerable dust on a hot, dry day, though the extent and exact location thereof were considerably disputed.
In July of 1985, Steve L. Davis was in his mid-twenties and lived in Richland, Mississippi. He had spent the morning of July 11 remodeling his grandparents' cabin at Eagle Lake north of Vicksburg. Davis was employed by Challenger Electric Corporation in Jackson and was due to report at 3:30 o'clock that afternoon for his shift. He left Eagle Lake somewhat before 2:00 p.m., thinking he had plenty of time to make it back to Jackson and get to work on time. Davis was driving a small Ford pickup truck, his traveling companions being three pets, a greyhound and two kittens.
Davis crossed the Yazoo River Bridge on Highway 61 traveling south and saw the first of the usual construction warning signs. He had traveled the area before and was aware of the construction zone, although it had not theretofore been a problem as the new road was being built some fifty to seventy feet to the west of the existing highway. Davis proceeded southward, driving through a school zone and up over a large hill. As he crested, he saw the construction ahead and to his right and saw the dirt and dust in the air, but it was all well west of his lane of travel. Davis was not concerned. Davis was traveling approximately 55 miles an hour at this point. He took his foot off the gas pedal but did not brake as he neared the construction area. In his words.
As I came down the Highway 61 that I was getting closer to the dust, I was still coasting. I was not braking or accelerating. I was just coasting through there and I was slowing down. And the dust was close to the road but it wasn't up on the road. The tick cloud, in my opinion, as I believed at that time in my judgment, was that there was work going on apparently on the edge of the median or in the median or on the shoulder of the road that they were building, that they were kicking up a lot of dust, and there must have been some enormous equipment in there churning up the road or grading or whatever they were doing, I didn't know. But there was a lot [of] dirt. I was not alarmed because I thought that it was just because they were working over there and making all the dirt. I did not see anything to tell me that there was going to be a truck to pull out. I didn't even see a truck.
.....
And I  as I went on down, all of a sudden it just [came] in as fast as you could blink your eye or just a split second's time, a big blanket or bank or wall of dirt, whatever you would call it, you couldn't see through it, it was just invisible. It just poured out onto the road, a big massive cloud of dust. And it was very thick. And at that time I saw it I had just checked my side view mirror and I noticed the front of the left side of the road was where the dust got super thick and the road was disappearing. And as my eyes moved over I saw the road disappearing before my very eyes. I mean it was just  it was going just as fast as it was going. I could see it leaving, you know.
Davis said the road disappeared in less than a second, and he doesn't remember if he even reached the brake pedal. He said he saw no warnings about trucks entering the highway.
*41 Davis has no memory of it, but his truck had smashed into the rear of a thirty-five foot Mack truck, an asphalt carrying and dumping truck, owned and driven by Ernest L. Whigham. It seems Whigham had just finished delivering and unloading his load of asphalt and had crossed the median area to the east and had turned onto the existing roadway, heading south. Whigham acknowledges the dust was heavy following his unladen truck when he pulled on to the highway. He admits after he pulled out he could not see in his rearview mirror because of the dust. He was proceeding ahead, having shifted into fourth gear, accelerating up to about twenty-five miles per hour and had covered no more than forty to fifty feet when he felt a thud on the rear of his truck.
The next thing Davis remembers, after reaching for his brakes was coming to,
being in my truck and there was the sound of dirt and metal and glass, all that settling kind of like  just a horrible sound. It was just like  it was the sound of destruction or the aftermath of destruction or whatever. There was just an awful silence of just dust and glass and dirt and whatever settling. And then I couldn't open my eyes. I could not see what was going on because I couldn't open my eyes and I couldn't move. And I could hear but I couldn't see. And someone, I don't know how long I was out or whatever, but someone came up and said that I had been in an accident and I was going to be okay, that help was on the way.
Davis said he remembers passing out and then waking to hear someone talking about his dog. He said he passed out again and then came to when someone told him they were placing him on a Lifestar helicopter to take him to University Hospital. Davis said he learned later that he was transported to Mercy Hospital by ambulance and was there for five hours before being transported by helicopter to University Hospital. The next time he woke up he was holding his wife's hand.
The extensive details of Davis' hospitalization and treatment and long road to recovery are too much to recount in full. They are less than pleasant, and we afford but a sampling. Because his jaw was broken in four places and his chin crushed, Davis was placed on a breathing machine. He also had a tracheostomy. His ribs were bruised and he developed "a pneumonia condition" where his temperature was around 105 for several days. Davis had fractured his neck and skull, had almost bitten his tongue off and had swallowed it. His stomach had been cut open to explore for internal bleeding; he left leg was broken and a seven inch portion shattered. Davis' kneecaps and feet were severely crushed and cut and his right big toe had been cut severely. His right eye was crushed and his left ear canal filled with blood. Davis said he was discharged from the hospital on August 13.
Upon discharge, Davis went to his home in Richland, where his wife and grandfather took care of him. His parents live just one door down, so they were also available to help. Davis finally returned to work in February, 1986, a week after getting off crutches because the family was about to lose everything and desperately needed money. Challenger changed Davis' duties, as he couldn't do all he once did. He could not lift anything over fifty pounds, and couldn't jump, run or place excessive stress on his body. He said he had problems going up ladders and problems squatting down.
In June, 1988, the doctors put Davis in the hospital to remove the rod from his leg. He returned to work in the following August. The doctors did not take the wires out of his chin until March, 1989. He has had extensive dental work done as a result of the accident and expects more. Davis said he used to participate in many sports but is unable now. Every morning his hip and knees are stiff. He has trouble looking in certain directions because of his neck injury, and has problems with his mouth and jaw.
Davis lost his job in September, 1989, because he exceeded Challenger's rule limiting the number of days an employee can miss in a year's time because of medical *42 treatment needed after an accident. At the trial, about two weeks after losing his job, Davis said he had not been able to find other employment. Davis said he lost $21,158.67 in wages while employed because of the injuries.

B.
On February 20, 1986, Steve L. Davis commenced the present civil action by filing his complaint in the Circuit Court of Hinds County, Mississippi, First Judicial District. Davis originally named as defendants W.J. Runyon & Son, Inc., and Key Constructors, Inc. He thereafter amended to proceed against truckdriver Ernest Whigham individually. Davis charged, inter alia, that Whigham was negligent in the premises and that Runyon was vicariously liable therefor. Davis charged as well that Runyon was guilty of independent negligence in failing to control vision-obstructing dust near the highway, among other things. Runyon denied all charges, particularly that of vicarious liability and countered, alleging Davis was negligent and, in any event, had assumed all risks incident to the occasion.
Prior to trial, Davis settled with two of the defendants. Key paid $20,000.00, and Davis gave a release. Whigham (through his liability insurance carrier) paid $95,000.00 and was similarly released. On October 5, 1989, the case proceeded to trial against Runyon only. After both parties had rested, the Circuit Court held the evidence sufficiently clear that whether Runyon was vicariously liable for Whigham's negligence, if any, could be determined as a matter of law and instructed the jury that Runyon was so liable. In due course, the jury returned a general verdict in favor of Davis and against Runyon in the sum of $1,200,000.00.
In due course, Runyon moved for judgment notwithstanding the verdict or, in the alternative, for a new trial, or, in the alternative, for a remittitur. The Circuit Court denied the motions. This appeal has followed.

III.
Runyon argues the Circuit Court erred when it denied Runyon's post-trial motion for judgment notwithstanding the verdict. Rule 50(b), Miss.R.Civ.P. The motion, of course, was but a renewal of Runyon's motion for a directed verdict at the conclusion of the plaintiff's case in chief and, as well, its renewal of that motion at the conclusion of all of the evidence. See Rule 50(a), Miss.R.Civ.P.
Our standards when considering such a point on appeal are so familiar that they need not be repeated here. See, e.g., Wilner v. MS Export R. Co., 546 So.2d 678, 681 (Miss. 1989); Guerdon Industries, Inc. v. Gentry, 531 So.2d 1202, 1205 (Miss. 1988); Stubblefield v. Jesco, Inc., 464 So.2d 47, 54 (Miss. 1984); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss. 1983); Paymaster Oil Mill Company v. Mitchell, 319 So.2d 652, 657 (Miss. 1975).
We think it apparent the jury may reasonably have believed Davis' testimony. To the point, there was substantial credible evidence through Davis and Whigham from which the jury could reasonably have found Runyon had not properly watered the premises or otherwise acted prudently to control the dust or secure motorists from its hazards. There was credible evidence that, when Whigham crossed the median area after dumping his load, his truck churned up a sizeable dust cloud that moved and drifted to the east, so that when Whigham turned his truck southbound onto the existing Highway 61, the road was enveloped suddenly by a cloud of dust just as thick and extensive as Davis says it was, that this cloud of dust obstructed Davis' vision, and because he could not see, he smashed into the rear of Whigham's truck. To be sure, we could put a spin on the facts that would be quite favorable to Runyon and would cast much of the blame on Davis. To do this, however, we would have to ignore Davis' testimony as well as reasonable inferences from Whigham's testimony.
Runyon argues Gartman v. Bush Construction Co., 227 So.2d 846 (Miss. 1969), is dispositive in his favor. Without doubt, *43 Gartman bears a surface similarity to today's case. In Gartman the plaintiff hit the rear end of a water truck after merely having taken his foot from the accelerator and not applying brakes. What distinguishes Gartman is the presence here of substantial evidence that the dust cloud appeared suddenly and unexpectedly in front of Davis. The Court below correctly denied Runyon a judgment notwithstanding the verdict.

IV.
Runyon principally argues the Circuit Court erred when it failed to dismiss, prior to submission of the case to the jury, Davis' claim against Runyon insofar as that claim was based on vicarious liability for Whigham's negligence. Runyon asserts two grounds.

A.
Runyon points to the pre-trial settlement Davis made with truck driver Whigham and, particularly, the written release Davis gave Whigham in exchange for Whigham's (liability insurance carrier's) payment of $95,000.00. Runyon argues the release had the effect of releasing Runyon from the vicarious liability charge Davis made against him. Runyon reasons that the settlement effects a full recovery by Davis for his damages and that by allowing Davis to proceed further, we allow him to be unjustly enriched. Runyon cites Nebraska law, particularly Mallette v. Taylor & Martin, Inc. Real Estate, 225 Neb. 385, 406 N.W.2d 107, 111 (1987), and Ericksen v. Pearson, 211 Neb. 466, 319 N.W.2d 76 (1982).
The release unequivocally provides at two points that it does not extend to "Key Constructors, Inc., W.J. Runyon & Son, Inc., and Liberty Mutual Insurance Company." It provides further, notwithstanding the release, Davis is
reserving ... [his] rights as to these entities including, but not limited to, W.J. Runyon & Son, Inc.'s liability to the plaintiff [Davis] as the employer of Ernest Whigham.
There was a day when parties had to be quite careful how they settled with less than all of the defendants in a pending action. It was once thought necessary that the plaintiff not even think, much less use, the words "settlement" or "release" in such an event. If he wished to settle he would take a writing labeled "a covenant not to sue," and we sanctioned such legal legerdemain. We are well past the days of such foolishness. Smith v. Falke, 474 So.2d 1044, 1045 (Miss. 1985); Burt v. Duckworth, 206 So.2d 850 (Miss. 1968).
There are all sorts of rational reasons why our law should allow a plaintiff to settle with less than all of multiple defendants and proceed against the remaining defendant or defendants. Public policy favors settlement, and a partial settlement is better than none at all. Such a settlement simplifies the issues remaining for trial. It reduces expense and conserves valuable judicial resources. There is the tactical hazard of having multiple defense lawyers taking shots at the plaintiff's case. Defendants sometimes fear each other, and because he does, one may buy his peace with plaintiff. It offends no policy of this state to allow a plaintiff to snatch the bird in the hand, then pursue the one in the bush as well. This is particularly so where, as here, Runyon is arguing so strenuously that Whigham is an independent contractor for whose defaults it has no liability. No language in the release Davis signed acknowledged that $95,000.00 compensated him for all of his damages. We perceive no reason we should not read the Davis-Whigham release as the parties wrote it. There is no error here.

B.

1.
At trial, the Circuit Court held the evidence sufficiently undisputed that in law Runyon was responsible for any damages Ernest Whigham may have caused by his negligence. Rejecting Runyon's independent contractor defense, the Circuit Court told the jury, via Instruction No. P-17,
that at the time of the accident which is the subject of this lawsuit, Ernest Whigham *44 was an employee of defendant, W.J. Runyon & Sons, Inc.
Runyon says the Circuit Court erred in this.
We need to be clear how Runyon is liable. Given the evidence the verdict tilts toward Davis, one theory of negligence crowds the others out. It begins with the fact that Runyon was building a new road bed, albeit fifty to seventy feet west of the existing highway. Roadbuilding by its nature is a dirty business, but this does not mean a contractor may throw up his hands and do nothing. Public policy suggests the contractor do his work consistent with motorists' continued use of the roadway, and, to facilitate this end, the contractor must take reasonable safety precautions. We find in MSHD Traffic Control Plan § 104.4:
If construction of the roadbed or continuous hauling over any portion of the project, including any haul roads, creates a dust hazard or nuisance, the Contractor shall alleviate such hazards or nuisances by sprinkling with water or by other approved methods.
By all accounts July 11, 1985, was a hot, dry, dusty day. Runyon recognized it should control the dust, among other reasons, to avoid traffic hazards to unsuspecting motorists. General contractor Key Constructors had provided a water pump about a quarter of a mile from the job site. Key's Vice President David Trevathan said under the day's dusty conditions he would have used flagmen on the road. Runyon had no flagman, but we are favored with considerable testimony from Tim Kirby, the driver of one of Runyon's two water trucks, explaining how he tried to keep down the dust. Despite these efforts, we find Ernest Whigham traversing the obviously-not-lately-nor-adequately-watered median, his truck kicking up a blinding ball of dust that suddenly enveloped the highway behind his truck, a ball so thick Whigham could not see what was to his rear, nor could the approaching Steve Davis see ahead. Indeed, the jury may reasonably have inferred the dust was so dense Whigham could not see adequately before he pulled out onto the highway.
Road contractors such as Runyon are not insurers of the safety of mid-construction motorists. Runyon was charged in law to appreciate the dust hazard and take reasonable steps that it not create undue dangers to the motoring public. The accident-causing agent is seen a coalescence of Whigham's truck's stirring up the dust cloud and/or his failing to take care not to impel such a cloud toward the highway and Runyon's (Kirby's) neglect to have the dust-prone median area sufficiently watered that the inevitable dust would not obstruct vision or otherwise create a danger to approaching motorists.
Of course, no one can show with certainty Whigham was not the lone villain, nor Kirby, nor someone else with dust control duties. But to consider an appeal such as this, we must assume some set of facts, and it simply makes sense to see the facts as we do in more familiar settings, as here in Part III above, when a party challenges a verdict on grounds of evidentiary insufficiency. Under this view, Runyon was tortiously and causally negligent through Whigham and without regard to him.

2.
Notwithstanding, Whigham's conduct was an integral part of the causal combination, and whether in law we may hold Runyon for it is important. Whether Whigham was so independent of Runyon that Runyon should not be held for his conduct is the sort of question courts variously label "a mixed question of law and fact," a question of "ultimate fact," or a "law application question." It is in this sense analogous to the question whether a party was negligent. We hold such an issue ordinarily one for the trier of fact. See, e.g., Luke Construction Company v. Jernigan, 252 Miss. 9, 15, 172 So.2d 392, 393-94 (1965). Where, as here, a party such as Runyon asks that the issue be submitted to the jury, the Court may properly decline only if it
can say, taking the evidence in the light most favorable to ... [Runyon] and considering all reasonable favorable inferences which may be drawn from the evidence in [Runyon's] favor ..., that no *45 hypothetical reasonable jury could find the facts in accordance with ... [Runyon's] theory... .
Hill v. Dunaway, 487 So.2d 807, 809 (Miss. 1986). This standard guides our review on appeal, as well. We have venerable recent authority that, where there is no genuine issue regarding the material facts, the Court can decide today's question without submitting it to the trier of fact. Webster v. Mississippi Publishers Corp., 571 So.2d 946 (Miss. 1990).

3.
We have confronted independent contractor defenses repeatedly and in a variety of contexts. Candor requires confession our cases have been less than consistent. We have talked of balancing tests and factor analyses, most prominently in Kisner v. Jackson, 159 Miss. 424, 428, 132 So. 90, 91 (1931). Some have suggested we follow a separate rule for pulpwood haulers. See Leaf River Forest Products, Inc. v. Harrison, 392 So.2d 1138 (Miss. 1981); Dunn, Mississippi Workers Compensation §§ 128 et seq. (1982); but see, Blackmon v. Payne, 510 So.2d 483 (Miss. 1987). There is much loose language in our reports.
A correct articulation of our substantive standard becomes critical. The trick is to ask the question right. Eschewing the labels  "independent contractor" or "employee"  what we have in mind as we assess the proof is whether Whigham was sufficiently independent of Runyon so that in justice and fairness Runyon ought not be held liable for Whigham's defaults. To ask whether Whigham was an "employee" or "independent contractor," as though finding the right label decides the case, puts the cart before the horse. Correct analysis applies the label only as a shorthand expression of a conclusion reached on other grounds. The reason this is so is suggested when we see the two categories are separated not by a line but by "a twilight zone filled with shades of gray." Fruchter v. Lynch Oil Co., 522 So.2d 195, 199 (Miss. 1988). It becomes clearer when we see "employee" and "independent contractor" empty vessels into which we pour varying content in varying contexts.
At least since 1885, we have in today's context (usually) described our divining rod in terms of right to control. The proverbial independent contractor defense is not available to one who holds the right to control a tortfeasor's injury-causing conduct. See New Orleans, Baton Rouge, Vicksburg & Memphis Railroad Co. v. Norwood, 62 Miss. 565, 568 (1885); Hutchinson-Moore Lumber Co. v. Pittman, 154 Miss. 1, 12, 122 So. 191, 193 (1929); Texas Company v. Mills, 171 Miss. 231, 233, 156 So. 866, 869 (1934), down through at least Fruchter v. Lynch Oil Co., 522 So.2d at 199.
The right-to-control test is sound in theory and in practice. One who engages the services of another and holds the servant in a legal relationship subject to a right of control has practical power to prevent the servant from committing torts. The rule of respondeat superior gives the master incentive to do this. White's Lumber and Supply Co. v. Collins, 186 Miss. 659, 672, 191 So. 105, 106 (1939). We have labeled "independent contractors" those we have found not under the master's right of control. Generally, such a person promises a certain output in exchange for the contract price. The master's concern is the finished product alone. Where the master may not supervise the inputs into this performance, he is per force not in a good position to prevent the contractor's torts and should not in justice be held for those torts absent independent negligence. McDonald v. Hall-Neeley Lumber Co., 165 Miss. 143, 151-52, 147 So. 315, 316 (1933); Kisner v. Jackson, 159 Miss. at 428, 132 So. at 91.
We have at times followed a factoring analysis and have fallen into fallacy. Careful thought of the factors[1] commonly used, *46 with one exception ("right-to-control"), reflects the characteristics one would often expect to find in relationships one labels, master-servant, on the one hand, or, independent contractor, on the other. But these characteristics, with the one exception, have but descriptive[2] and not prescriptive power. For example, whether a worker "furnishes the means and appliances for the work" or whether he "furnishes the material upon which the work is done" tells us little of whether in law one has sufficient right of control of the behavior of the other so that in justice and fairness the former ought be liable for the latter's torts. Conversely, one who engages the services of an independent contractor may have just as much "right to inspect the progress of the work" as does a master of his servant's work. This is why an appreciable number of our cases dutifully list the factors and go on to say the primary factor is the right to or the degree of control. See, e.g., Mississippi Employment Security Commission v. PDN, Inc., 586 So.2d at 842; Texas Co. v. Wheeless, 185 Miss. 799, 817, 187 So. 880, 889 (1939).
Shorn of its mythology and elaborate factor analyses, the question may be simply put: whether the project owner maintains a significant de jure right or de facto power of control over the performance of aspects of the work from which the injury has arisen or to which it is reasonably incident. Magee v. Transcontinental Gas Pipe Line Corp., 551 So.2d 182, 186 (Miss. 1989). Where the accident arises out of or in connection with work activities the master had a de jure right or de facto power to control, or as a reasonable incident thereto, the master should be vicariously liable for the servant's defaults. This is no precise formula, nor is it susceptible of mechanical application. Over a range of cases we see we have not shorn it of its shades of gray. Still, it is the better framing of the question, and an affirmative answer yields vicarious liability. A negative answer and the plaintiff must look to the tortfeasor alone.

4.
Runyon argues strenuously there is substantial evidence from which the jury could have found it without vicarious liability. We are told Whigham was an independent hauler who was self-employed. Whigham owned the thirty-five foot dump truck involved in the accident, made the payments on the truck, took care of the maintenance of the truck, and provided fuel for the truck. He was paid by the load and not by the hour. Runyon withheld no taxes from Whigman's compensation. Whigham says he could control how much money he made by how many loads he carried. He says he hauled for other companies besides Runyon. Prior to working on this project, Whigham maintained his own liability insurance in the statutory sum of $300,000.00. *47 Whigham's only contacts with Runyon's employees were through the person who asked him to haul loads and the dispatcher who informed him where on the construction site he was to deliver the asphalt. Whigham says that Runyon did not exercise any control over how he got the asphalt from the place where he loaded his truck to the place on the construction area where he dumped his load. All of this is interesting, but it does not carry us far.
Runyon presses credulity when it goes on to argue Whigham had the freedom of scheduling his lunch breaks and leaving the truck if he needed to attend to other matters. Runyon's foreman said the independent truck drivers could do as they pleased which further evidences a lack of control.
None of this belies that Runyon needed the trucks to do its job. It took seven to eight trucks to keep up with the capacity of Runyon's hot mix plant. Runyon needed about five deliveries an hour to lay the asphalt road bed. These trucks needed to be sequenced, their schedules coordinated, all of which would seem obvious were it not denied. Runyon argues that Whigham ran the risk of not being paid if the asphalt went cold; however, the proof showed that if the hot mix got cold on the job, it did so at Runyon's expense. All of the drivers of asphalt trucks, whether owned by Runyon or not, were doing the same work and were hauling and coming back down the same road. They received loads of asphalt from Runyon's hot mix plant south of Vicksburg, carried it to the job site north of town and poured it on the roadbed per instructions. Unladen, they returned to the hot mix plant for another load. All haulers received the same instructions as to how to enter and leave the construction site. Runyon could terminate Whigham at any time he was not doing his job, the same as with those admitted employees. Indeed, on this record we cannot believe Runyon expects us to believe it would not have promptly fired Whigham had he failed substantially to load and deliver according to schedule, and make a prompt exit thereafter to fetch the next load.
The facts of this case leave no serious question about Runyon's de jure right and de facto power to control the relevant details of Whigham's work, those incident to his approach to and his exit from the job site. Runyon held this right and exercised this power, and the Circuit Court correctly held that Whigham, as a matter of law, was an employee of Runyon. As Whigham summed things up: "I was not working for myself. I was hauling for Runyon."

5.
We reiterate and reacknowledge the Circuit Court's limited authority to decide the question and withhold it from the jury. Still, we think the evidence, taken in the light most favorable to Runyon, nevertheless shows that Runyon had sufficient de facto and de jure control over those aspects of Whigham's work proximately leading to the accident that the Circuit Court was correct when it held Runyon vicariously liable.

V.

A.
Runyon argues the Circuit Court erred when it refused to allow evidence of Davis' settlement with Key Constructors, Inc. and Ernest Whigham. We are told numerous references were made to Whigham before the jury and that "the jurors must have been confused and wondering what happened to Key and Whigham himself."
After some vacillation over the years, we settled this point in Whittley v. City of Meridian, 530 So.2d 1341, 1346 (Miss. 1988). Concerned that a plaintiff not have a double recovery and that we protect his jury from irrelevant influences, we directed that the trial judge, post-verdict, reduce the amount of the jury's award by any sums the plaintiff has received in settlement for the damages covered by the verdict. We rejected then  and now  the practice of advising the jury at trial of the amount and other details of a prior settlement.

B.
At oral argument, Runyon enlarged the present point, arguing that it had a right to *48 tell the jury of its settlement with Whigham because the settlement agreement gave Whigham an interest in the outcome of Davis' trial against Runyon. This is so in the practical sense that Whigham had just bought his peace, and the cynical among us would assume favorable testimony a likely, if unstated, consideration. It is so in the legal sense that Runyon, as a party vicariously liable for Whigham's conduct, may well have a right of indemnity of and from Whigham. Granquist v. Crystal Springs Lumber Co., 190 Miss. 572, 582, 1 So.2d 216, 218 (1941). Moreover, Whigham might have retarded Runyon's indemnity advance by giving testimony suggesting Runyon's independent negligence. See Bush v. City of Laurel, 215 So.2d 256, 260 (Miss. 1968). In Davis' settlement with Whigham, he covenanted that he would in turn indemnify Whigham in the event Runyon should successfully obtain a verdict against him.[3]
There is no getting around the fact that this settlement agreement as structured gave Whigham an interest in the outcome of Davis' suit against Runyon. Nor is there any getting around Rule 616, Miss.R.Ev., which reads:
For the purpose of attacking the credibility of a witness, evidence of bias, prejudice, or interest of the witness for or against any party to the case is admissible.
The Circuit Court erred insofar as it denied Runyon the right to show Whigham's interest. Whether the error requires reversal, however, is another matter. We do not reverse for errors admitting or excluding evidence "unless a substantial right of the party is affected." Rule 103(a), Miss. R.Ev.; see also, Rule 61, Miss.R.Civ.P.
Two matters militate against reversal. First, notwithstanding the practical inference that Whigham may have led Davis to expect his cooperation as a witness at trial, the indemnity agreement may well have given Whigham a pro-Runyon interest. If Whigham testifies favorably to Runyon's position on the independent contract defense, he enhances the likelihood that Runyon will never (have occasion to) pursue him for indemnity. More practicably, we note that Whigham had given an extensive pre-trial deposition. There is no suggestion that his trial testimony varied in material particulars from his deposition testimony, notwithstanding his eleventh hour settlement and arguable abandonment of the Runyon defense interest. We think the existence of this deposition guarded adequately that Whigham not wiggle from his true memory. Under all of the circumstances, we decline to reverse on this point.

VI.
Runyon argues the Circuit Court abused its discretion when it refused to submit the case to the jury on special written interrogatories. Runyon makes the point in the context of Davis' two theories of liability: (1) whether Runyon, independent of Whigham's actions, was negligent, and (2) whether Whigham was negligent and Runyon vicariously liable therefor. Runyon insists these are separate and distinct theories of recovery. To channel and keep distinct the jury's deliberations, Runyon sought special interrogatories.
Rule 49(b), Miss.R.Civ.P.,[4] provides that the circuit court may submit the case on *49 special interrogatories only. Runyon resorts to Rule 49(c) which provides alternatively the court may, in its discretion, submit with the instructions for a general verdict, accompanied by written interrogatories. These interrogatories may inquire concerning issues of fact necessary to the decision. This rule is explicit in its language which provides the court "may, in its discretion," provide for written interrogatories. Because we have no guidance upon this issue, we look to the federal rules and case law.
Our Rule 49(c) essentially mirrors Federal Rule 49(b). In cases where a district court has refused written interrogatories, the Fifth Circuit has refused to reverse, holding the decision one within the sound discretion of the district court and subject to reversal only upon a clear showing of abuse. Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1298 (5th Cir.1974); Abernathy v. Southern Pacific Co., 426 F.2d 512 (5th Cir.1970).
Runyon says the reason it needed special interrogatories is, it holds indemnity rights of and from Whigham and needs to know whether its liability to Davis proceeds from its independent negligence or is derivative from Whigham.[5] Given the evidence, it is hard to imagine the two isolated, as we have noted above. Whigham's truck kicked up the dust cloud Runyon's water trucks had failed to control. This strips the present point of its logical appeal, and as well the punch of the Fifth Circuit's opinion in Jones v. Miles, 656 F.2d 103, 106 (5th Cir.1981), from which Runyon quotes liberally. The Circuit Court did not abuse its discretion.

VII.
Runyon next argues that the Circuit Court erred when it denied Runyon's motion for a new trial. See Rule 59(a), Miss. R.Civ.P. Again, our standards are familiar. Bobby Kitchens, Inc. v. Mississippi Insurance Guaranty Association, 560 So.2d 129, 132 (Miss. 1989); see also, Stewart v. Davis, 571 So.2d 926, 932 (Miss. 1990). Having in mind the factors enumerated in Kitchens and subsequent cases, we have repeatedly held we will not reverse a trial court's denial of a new trial absent a substantial abuse of discretion. McGory v. Allstate Insurance Co., 527 So.2d 632, 637 (Miss. 1988); Clark v. Columbus & Greenville Railway Co., 473 So.2d 947, 950 (Miss. 1985). Here, we cannot begin to say that the verdict was contrary to the weight of the evidence or that it was the product of bias, passion or prejudice, nor that the Kitchens factors suggest this case be tried anew. There is no error here.

*50 VIII.
Beyond this, Runyon urges, on the issue of damages alone, the $1,200,000.00 verdict is excessive and that we should set it aside and order a new trial or, at the very least, order a remittitur.[6]
The evidence reflected Davis had incurred $64,401.06 in past medical expenses and more than $4,000.00 in projected future medical expenses. He had lost his job and lost past wages of $21,158.67. Dr. James Langston Hughes, orthopedic surgeon, testified Davis suffered a twelve percent permanent partial impairment to the body as a whole because of his permanent neck injury. Without doubt, Davis suffered a substantial temporary total disability. Moreover, Davis suffered great pain and suffering and discomfort and downright indignity in the days and months following his accident. He has suffered as well a partial loss of the enjoyment of life. Cf. Jones v. Shaffer, 573 So.2d 740, 744-46 (Miss. 1990) (concurring opinion); McGowan v. Estate of Wright, 524 So.2d 308, 311-13 (Miss. 1988) (concurring opinion). He has a permanent wire in his mouth.
Assuming liability Davis enjoys the right to damages such as will compensate him for all of his losses, past and future. He is entitled to the present worth of all that has been forced upon him and with which he must live hereafter. Granting that the jury was bound to find at least some negligence attributable to Davis and, accordingly, to reduce his award in proportion thereto, we cannot say that no rational jury could on this proof return a verdict of $1,200,000.00 for a man so injured when he was only twenty-five years of age.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, PITTMAN, BANKS and McRAE, JJ., concur.
DAN M. LEE, P.J., does not join this opinion.
NOTES
[1] We refer here to the most familiar of such analyses from Kisner v. Jackson:

Whether the principal master has the power to terminate the contract at will; whether has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; whether he furnishes the means and appliances for the work; whether he has control of the premises; whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; whether he has the right to prescribe and furnish the details of the kind and character of work to be done; whether he has the right to supervise and inspect the work during the course of the employment; whether he has the right to direct the details of the manner in which the work is to be done; whether he has the right to employ and discharge the subemployees and to fix their compensation; and whether he is obliged to pay the wages of said employees.
Kisner, 159 Miss. at 428, 132 So. at 91. A shorter list employed in a different context appears in Mississippi Employment Security Commission v. PDN, Inc., 586 So.2d 838 (Miss. 1991): The factors to be considered in determining the employee/independent contractor issue are:
(1) The extent of control exercised over the details of the work;
(2) Whether or not the one employed is engaged in a distinct occupation or business;
(3) The skill required in the particular occupation;
(4) Whether the employer supplies the tools and place of work for the person doing the work;
(5) The length of time for which the person is employed;
(6) The method of payment, whether by the time or by the job; and
(7) Whether or not the work is a part of the regular business of the employer. (citation omitted)
Mississippi Emp. Sec. Com'n v. PDN, Inc., 586 So.2d 838, 841 (Miss. 1991).
[2] Proof of the factors listed in Kisner and progeny is, of course, relevant to the issue, albeit inferentially, and is admissible at trial. Rules 401, 402, Miss.R.Ev.
[3] The release read in part:

The undersigned, Steve and Miriam Davis agree to indemnify, defend, and hold harmless the parties released herein from any other claim or expense whatever arising out of or in any way connected with that certain accident which occurred on or about July 11, 1985 on Highway 61 South near Vicksburg, Mississippi. This agreement to indemnify, defend and hold harmless specifically includes, but is not limited to, any and all subrogation claims or indemnity claims which have been brought or which may be brought by Traveler's Insurance Company, Key Constructors, Inc. or W.J. Runyon & Son, Inc. against the parties released therein.
[4] Rule 49(b) and (c) of, Miss.R.Civ.P. read as follow:

(b) Special Verdict. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.
(c) General Verdict Accompanied by Answers to Interrogatories. The court, in its discretion, may submit to the jury, together with instructions for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers and to render a general verdict. When the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered. When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered consistent with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.
[5] If Runyon were so serious about its indemnity claim, it could have brought it in the present action. See Rule 14, Miss.R.Civ.P.
[6] Mississippi Code § 11-1-55 provides:

The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence. If such additur or remittitur be not accepted than the court may direct a new trial on damages only. If the additur or remittitur is accepted and the other party perfects a direct appeal, then the party accepting the additur or remittitur shall have the right to cross appeal for the purpose of reversing the action of the court in regard to the additur or remittitur.
Miss. Code Ann. § 11-1-55 (Rev. 1991); Leach v. Leach, 597 So.2d 1295 (Miss. 1992).