**FIRST BANK, Plaintiff,**

v.

**EASTERN LIVESTOCK COMPANY, Defendant.**

**Civ. A. No. 3:92cv469(L)(N).**

United States District Court,
S.D. Mississippi,
Jackson Division.

May 17, 1995.

Dennis L. Horn, Horn & Payne, Jackson, MS, for plaintiff.

Denise F. Schreiber, Alston, Rutherford, Tardy & Vanslyke, Jackson, MS, for defendant.

### MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the summary judgment motion of defendant Eastern Livestock Company (Eastern). Plaintiff First Bank has responded to the motion, and the court, having considered the memoranda of authorities along with exhibits presented by the parties, concludes for the following reasons that defendant's motion should be denied.[1]

Eastern is a livestock company engaged in the business of buying and selling cattle. From January through March of 1989, Eastern entered into a series of "buy back" agreements with Harry Wells, a cattle farmer in Amite County, Mississippi, pursuant to which Eastern agreed to deliver and/or sell

---

1. The court has previously denied cross-motions for summary judgment in this cause, concluding that there is a genuine issue of material fact as to whether First Bank had a valid security interest in the collateral that is the focus of this litigation.

*See First Bank v. Eastern Livestock Co.,* 837 F.Supp. 792 (S.D.Miss.1993). It is implicit in Eastern's motion that it has confessed the validity of First Bank's security interest solely for the purposes of this motion.

cattle to Wells, and then purchase those cattle back from Wells after he had "grown them out." Under at least one of these agreements, Wells was not required to pay Eastern for the cattle upon delivery; rather, the amount Wells owed Eastern for the cattle would be subtracted from the price Eastern would eventually pay Wells for the fattened cattle, pursuant to the agreements.[2] For several years prior to and through January of 1989, plaintiff First Bank had provided financing for Wells' cattle operations.

This case arises because, on May 23, 1989, Eastern paid Wells, as sole payee, a check in the amount of $253,647.92 for certain fattened cattle. First Bank contends that it held a valid security interest in the cattle for which the check was meant to pay, as it contends it did in all of Wells' cattle through an after-acquired property clause in its security agreements with Wells. Yet it never received any of the monies represented by this check. Thus, it brought this action against Eastern, alleging that Eastern's act of making a check to Wells as sole payee constituted conversion of the cattle in which it had a security interest.

## I. Applicable Statute of Limitations

■ Eastern first argues that First Bank's claim is time-barred by the three-year statute of limitations of Miss.Code Ann. § 15–1–49. The parties agree that First Bank's cause of action accrued on or about May 23, 1989, when it paid the subject check to Wells; it filed this lawsuit on August 11, 1992, approximately three years and three months later. Were a three-year statute of limitations in fact applicable, as contended by Eastern, First Bank's claim would be untimely. The court concludes, however, that the applicable limitations period is the six-year period provided by § 15–1–49 at the time plaintiff's cause of action arose.

Tort actions for conversion are governed by § 15–1–49, Mississippi's residual statute of limitations. At the time plaintiff's claim accrued in May 1989, that statute provided a six-year limitations period. However, the Mississippi legislature amended the statute in 1989, reducing the limitations period from six to three years. The amended statute had an effective date of July 1, 1989, and included a "savings clause," providing that the new three-year period was to apply "only to causes of action accruing on or after July 1, 1989." The following year, the legislature again amended the statute, effective March 12, 1990, adding a section addressed to actions involving latent injury or disease.[3] In reenacting the statute, the legislature omitted the savings language that had been part of the 1989 amendment. From that fact, Eastern reasons that for cases filed after the 1990 amendment, regardless of when the cause of action arose, the three-year limitations period applies.

■ Eastern's argument flows from an erroneous premise, that the 1989 amendment shortening the limitations period would have applied retroactively to causes of action that had already accrued had it not been for the savings clause. Many states as a general rule apply shortened limitations periods retroactively so long as the plaintiff is given a reasonable time period in which to file his claim after the announcement of the new period. *See, e.g., Fust v. Arnar–Stone Laboratories, Inc.,* 736 F.2d 1098, 1100 (5th Cir. 1984) (applying Louisiana law). The Mississippi Supreme Court, however, has not embraced this rule, and has instead held that the courts "may not give retroactive effect to newly enacted statutes of limitations shortening the period within which a claim arising prior to enactment must be brought." *Kilgore v. Barnes,* 508 So.2d 1042, 1044–45 (Miss.1987); *see also Bankston v. Pass Road Tire Center, Inc.,* 611 So.2d 998, 1004 (Miss. 1992) (concluding that "the six-year limitation

---

**2.** According to Wells' own deposition testimony, there is a question of fact as to whether funds provided by First Bank financed the purchase of these cattle eventually bought back by Eastern through the check made only to Wells, or whether Wells was ever required to pay Eastern "up front" for cattle upon delivery to him.

**3.** The new language stated that in actions involving latent injury or disease, the cause of action would not accrue until the plaintiff "discovered, or by reasonable diligence should have discovered, the injury." That provision was made to apply to "all pending or subsequently filed actions."

period would apply [to the claim there at issue] as the claim arose under the six-year statute").

■ The court recognizes that the legislature may effect retroactive application of a shortened limitations period by so providing in the statute itself, or otherwise clearly expressing its intent that the new period apply to causes of action that have already accrued. Here, however, upon amending the statute to shorten the limitations period to three years, the legislature expressed a contrary intent, and one which this court views as consistent with Mississippi case law on the point: the shorter period would apply "only to causes of action accruing" on or after the effective date of the statute. Eastern maintains that by omitting the savings language in the 1990 amendment, the legislature thereby "clearly expressed an intent" that the shorter limitations period apply to already-accrued actions, and "clearly intended" to make the three-year period retroactive. This court infers no such intent from the mere failure of the legislature to retain the savings language, and therefore, rejects Eastern's position. Accordingly, the court concludes that First Bank's conversion claim was timely commenced.

## II. First Bank's Consent to the Sale

■ Eastern next argues that irrespective of whether First Bank had a valid perfected security interest in Wells' cattle, its purchase of cattle from Wells was not subject to that security interest for the reason that First Bank authorized and/or acquiesced in Wells' sale of cattle to Eastern. The usual rule under Mississippi's Commercial Code is that

> a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Miss.Code Ann. § 75–9–306(2). Under the Code, a buyer in ordinary course of business takes free of a security interest created by his seller. *See* Miss.Code Ann. § 75–9–307. However, excepted from this usual rule are "person[s] buying farm products from a person engaged in farming operations." *Id.* In that circumstance, the secured party's interest follows the collateral into the hands of the buyer unless the seller has consented to the sale in accordance with § 75–9–306(2).

In the case at bar, Eastern submits that First Bank not only authorized Wells to sell cattle to it, but in fact intended for him to do so. It contends that in view of the bank's consent, it must be concluded under § 75–9–306(2) that the sale cut off First Bank's security interest in the collateral. First Bank argues that Eastern's argument on this point is foreclosed by Mississippi law.

In *Oxford Production Credit Association v. Dye*, 368 So.2d 241 (Miss.1979), the Mississippi Supreme Court rejected the contention of the defendant cotton purchaser that the seller's lender, which had a security interest in the cotton, had "waived" its right to proceed against her by acquiescing in its debtor's sale of the cotton to her. The court concluded that because the security agreement expressly prohibited the debtor's sale of the collateral without the lender's written consent, then in the absence of proof of the lender's written consent, the sale did not cut off the lender's security interest and the lender could maintain its claim against the buyer "for sums paid to the farmer ... for cotton to the extent that such sums were not then paid over to [the secured party]." *Id.* at 242–43. *See also United States v. Harrell's Stockyards, Inc.*, 652 F.Supp. 452 (S.D.Miss.1987).

In the case at bar, as in *Dye*, the security agreement provided that the collateral could not be sold without the written consent of the secured party, First Bank.[4] And here, as in *Dye*, there is no evidence of written consent. *Id.* But in *Dye*, as distinguished from this case, there was no suggestion that the lender

---

4. The agreement provided:
   Debtor shall not sell or otherwise dispose of any of the collateral without the prior written consent of the Bank. The inclusion of pro-

ceeds in this agreement does not authorize debtor to sell, dispose of or otherwise use the collateral in any manner not specifically authorized by the agreement.

had waived the provisions of the security agreement. Eastern contends here that First Bank effectively waived the language of the security agreement requiring written consent to sale by routinely authorizing and allowing Wells' sales of cattle over an extended period. It argues, then, that First Bank thereby waived its security interest in the cattle.

In support of its position in this regard, Eastern relies on *First National Bank v. Iowa Beef Processors*, 626 F.2d 764 (1980), and *North Central Kansas Production Credit Ass'n v. Washington Sales Co.*, 223 Kan. 689, 577 P.2d 35 (1978). Both cases are distinguishable from the case at bar. In the former case, *Iowa Beef Processors*, while the security agreement between the lender and debtor was silent as to the debtor's authority to sell the collateral, there was undisputed evidence that as a matter of practice, the bank had given its debtor general authorization to sell collateral subject only to his duty to remit the proceeds to the bank. Under those circumstances, the court held that the bank had no right to proceed against the buyer for satisfaction when the debtor sold the collateral without accounting to the bank for the proceeds. The court acknowledged that the Code places the greater burden on a purchaser to check for liens on collateral, and the proof showed that the buyer had not checked to determine whether a security interest was involved. *Id.* at 768. This failure was deemed immaterial, though, since even had the buyer checked, "the bank presumably would have informed [the buyer] that it (the bank) had agreed to allow buyers to pay [the debtor] directly." *Id.*

In the second case cited by Eastern, *North Central Kansas Production Credit Ass'n*, the security agreement prohibited the debtor's sale of collateral without the secured party's written consent, but granted the debtor authority to sell the property on condition that payment be made jointly to the debtor and

secured party. The proof showed, though, that despite these terms of the security agreement, the secured party did not require compliance with the written consent provision and, with knowledge of sales by the buyer, did not object when the checks for payment on those sales were made only to the debtor. The court concluded that by its actions, the lender had not consented to the sales, and thus had not waived its security interest by implicitly permitting its debtor to sell collateral subject only to his accounting to the bank for the proceeds. *Id.* 577 P.2d at 41.[5] The lender was nevertheless precluded from proceeding against the third-party buyer for conversion, since

> [the debtor] was specifically authorized to sell the cattle and receive the proceeds. [His buyer], derivatively, was authorized to sell the livestock and make payment to [the debtor]. Under the peculiar and specific facts of this case, we conclude that there was no conversion.

577 P.2d at 42.

In the court's opinion, even if the proof in this case were to support Eastern's suggestion that First Bank implicitly authorized Wells, though its course of dealings with him, to sell the collateral and receive payment exclusively in his name, First Bank still would not have waived its security interest in the collateral. The rationale of the court in *North Central Kansas Production Credit Association* is persuasive:

> The action of [the secured party], in accepting payment for the isolated … sales … can hardly be construed as a voluntary and intentional renouncement of its interest in all of the collateral included in the … security agreement.

> We also conclude that the equitable doctrine of waiver should not be utilized in favor of one who has constructive notice of a lien, and admittedly has been remiss in

---

**5.** In so concluding, the court noted a sharp division of authority in this area, and expressly rejected a line of authority represented by *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967). In the *Thomas* case, the court had held that the bank had waived its security interest where "by common practice, custom, usage,

and procedure, [it] had acquiesced in and consented to the sale, despite a clause in the security agreement prohibiting sales without its written consent." Notably, the Mississippi Supreme Court in *Dye* also implicitly rejected *Thomas*. *Dye*, 368 So.2d at 242.

checking public records maintained, at least in part, for his protection.

577 P.2d at 41.[6]

■ The court would observe that in accordance with the further reasoning of the court in *North Central Kansas Production Credit Association,* First Bank would arguably be precluded from maintaining a conversion claim against Eastern if Eastern contended or were able to show that First Bank authorized Wells to sell the cattle and receive payment in his name only. However, First Bank maintains, and there has been no proof to the contrary, that it never authorized Wells to receive payment in his own name, and instead, the pattern and practice over a period of five or six years was to require purchasers of Wells' cattle to issue joint checks to Wells and First Bank.

For the foregoing reasons, then, Eastern's argument that it is entitled to summary judgment based on First Bank's alleged consent to Wells' sale of the collateral is not well taken.

### III. First Bank's Settlement With and Release of Wells

■ Two state court lawsuits by and between First Bank and Wells were ultimately settled with Wells paying First Bank approximately $250,000. In January 1994, those parties executed a mutual release, with each releasing the other from any further liability relating to those lawsuits. Eastern now contends that since its liability is merely derivative of Wells' liability, then First Bank's release of Wells operates to relieve Eastern of potential liability. It contends, alternatively, that it is entitled to a set-off of any amount of its liability by the $250,000 that Wells paid First Bank in settlement of its claims against him.

The first of the two state court lawsuits was a lender liability action filed by Wells and his wife, charging that First Bank breached an alleged promise to continue financing Wells' cattle business. That suit was settled by Wells' payment of $40,000 to First Bank and First Bank's agreement to write off much of Wells' debt to reduce his total indebtedness to $500,000. In addition, First Bank agreed to cancel various liens against certain of Wells' property. When Wells failed to pay on his outstanding indebtedness, First Bank initiated foreclosure proceedings. Wells responded by filing a second lender liability suit against First Bank asserting the same claims that had been alleged in the first lawsuit, together with an additional charge that the bank had breached its agreement to cancel the liens against his property. First Bank counterclaimed for the amount of money owed by Wells—at that time over $500,000—and for foreclosure of Wells' farm. That suit was settled by Wells' payment of $210,727.91,[7] and the parties' execution of a "Mutual Release" of "any and all claims, counterclaims, actions, causes of action, demands, rights, damages and costs in compensation of any type related to Civil Action, File No. 5199," the second lawsuit.

■ *Oxford Production Credit Association v. Dye,* 368 So.2d 241 (Miss.1979), the controlling case in this jurisdiction, makes clear that a buyer of farm products may be held "jointly liable" with the farmer, and a joint judgment entered against them, if the buyer, with actual or constructive notice of a security interest in such products, makes payment solely to his seller. Under the law in Mississippi, the release of one joint tortfeasor does not release other joint tortfeasors. *See Lee v. Wiley Buntin Adjuster, Inc.,* 204 So.2d 479 (Miss.1967); *Hunnicutt v. Wright,* 986 F.2d 119 (5th Cir.1993). In applying this rule, the Mississippi court does

---

**6.** Mississippi has established a centralized filing system, pursuant to the Food Security Act, 7 U.S.C. § 1631, to aid buyers in discovering if the farm products they are purchasing are encumbered by any lien. Miss.Code Ann. § 75–9–319. The earlier opinion of this court concluded that First Bank's UCC–1F financing statement was adequate to give potential buyers such as Eastern notice of any security interest it had in the cattle, though the court held that there is an issue of

fact concerning whether First Bank, in fact, had a valid security interest in the subject cattle. *First Bank v. Eastern Livestock Co.,* 837 F.Supp. 792 (S.D.Miss.1993).

**7.** According to First Bank, this figure represented the bank's estimate of what it could recoup on the Wells' available collateral through foreclosure.

not differentiate between those who are joint tortfeasors and those who have joint liability, such as masters and servants, or principals and agents. *Cf. Capital Transport Co. v. McDuff,* 319 So.2d 658 (Miss.1975). Most recently in *W.J. Runyon & Son, Inc. v. Davis,* 605 So.2d 38 (Miss.1992), the court concluded that a plaintiff's settlement with and release of the driver of the truck that injured him did not operate to release the driver's employer, who was properly held vicariously liable to the plaintiff. The court said:

It offends no policy of this state to allow a plaintiff to snatch the bird in the hand, then pursue the one in the bush as well.

*Id.* at 43.[8] The fact of First Bank's release of Wells, therefore, does not preclude this action against Eastern.[9]

■ Of course, a plaintiff may not have a double recovery of the amount of damages it has sustained, and therefore, when the injured party releases or settles with one joint tortfeasor or joint debtor and then sues the other, that other joint tortfeasor is entitled to be given credit for the amount already recovered. *Garcia v. Coast Electric Power Association,* 493 So.2d 380, 384–85 (Miss. 1986); *Hunnicutt v. Wright,* 986 F.2d 119 (5th Cir.1993) (quoting Parker, *Mississippi Law of Damages* § 17–10, at 236). However, it appears undisputed that prior to the first settlement, Wells owed First Bank roughly $1,000,000, an amount far in excess of the $253,647.92 involved in Eastern's alleged conversion.

## IV. Eastern's Entitlement to an Offset

■ Several months after the transaction that has given rise to this lawsuit, Eastern entered into another buy-back agreement with Wells and ultimately, in September 1989, tendered a $158,361.41 check to Wells in payment for cattle purchased under that later agreement. It is undisputed that Eastern included First Bank as a joint payee on that check.[10] In its motion, Eastern submits that if it is ultimately found to be liable to First Bank for conversion through having failed to account for First Bank's security interest in making its May 1989 payment to Wells, the amount of its liability must be offset by the $158,361.41 which it effectively paid to First Bank.[11] It claims, in other

---

**8.** Eastern relies on *Farmers State Bank of Delavan, Minnesota v. Easton Farmers Elevator,* 457 N.W.2d 763 (Minn.Ct.App.1990), as support for its position. There, the buyer paid the sellers/debtors directly and exclusively for crops, in disregard of the bank's security interest. The bank settled its claim against the debtors and released them from their debt to the bank. The buyer argued that the release of the debtor operated to release it from further liability and the court agreed, stating,

A settlement between the secured party and the farmer operates to discharge any secondary liability of the grain buyers. The liability of the grain buyers in that situation is *vicarious* and conditioned completely on proof that the secured party has a valid claim against the *farmer,* who is in a position analogous to a primary tort-feasor.

457 N.W.2d at 766 (citations omitted). Inasmuch as Mississippi law holds, contrary to Minnesota law, that the release of a primary tortfeasor does not operate to release one who is merely secondarily liable, *see W.J. Runyon & Son, Inc. v. Davis,* 605 So.2d 38 (Miss.1992), Eastern's reliance on the *Farmers State Bank* case is misplaced.

**9.** Eastern has not contended that First Bank actually *intended* to release Eastern, but rather has argued that such is the *effect* of the Wells release. It is clear that under Mississippi law, "[i]n a

release contract, 'a party releases only those parties whom he intends to release'...." *Pemberton v. State Farm Mut. Auto. Ins, Co.,* 803 F.Supp. 1187 (S.D.Miss.1992) (quoting *Smith v. Falke,* 474 So.2d 1044, 1047 (Miss.1985)). Here, it seems highly unlikely that this was First Bank's intent, since at the time the release was executed, this action was pending and had been for quite some time.

**10.** In addition to Wells, the check was made payable to First Bank, Trustmark National Bank and John William Powell, all creditors of Wells.

**11.** Whether First Bank was ever paid the money represented by this second Eastern check is immaterial to the resolution of this aspect of Eastern's motion, since Eastern's argument on this point is premised solely on the fact that it included First Bank as a payee on this later check. The court would note, though, that First Bank never actually received any money in connection with that later check. In February 1990, First Bank, upon being presented this second Eastern check by Wells, inexplicably endorsed it over to Wells in exchange for Wells' own check to First Bank for $138,000. Wells' check to First Bank was returned several times because of insufficient funds and First Bank never collected on his check. On the other hand, Eastern's bank properly paid Wells on Eastern's check for $158,-

words, that it is entitled to a credit for the amount it has already paid to First Bank. Eastern is not entitled to summary judgment on this issue.

One might well deduce that Eastern's inclusion of First Bank as a joint payee on its September 1989 check to Wells was in recognition of a security interest held by First Bank in the cattle for which Eastern was at that time making payment. If First Bank indeed had a valid security interest in those cattle, as it claims, then it was surely entitled to be included as a payee on Eastern's check in payment for those cattle and Eastern would have compounded its potential liability by failing to make the check payable to First Bank, as well as Wells. If it were Eastern's position either that First Bank did not, in fact, have a valid security interest in those cattle such that it was not entitled to be made a payee on the check and/or that Eastern's inclusion of First Bank as a payee on the second check was intended as a payment toward reducing its potential liability to First Bank for having not included it on the earlier check, then a set-off would perhaps be in order. However, the facts as now developed do not support either of these arguments, and it is therefore not appropriate for summary resolution. Thus, the court finds Eastern's set-off argument to be without merit, and the action against it remains for the amount of $253,647.92.

## Conclusion

Based on the foregoing, it is ordered that Eastern's motion for summary judgment is denied.

---

361.41. First Bank's chief executive officer, who was the bank's president at the time of the transaction in question, testified in his deposition that First Bank had been "hoodwinked again" by Wells on the matter of the second Eastern check.